IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GIFFORD PINCHOT TASK FORCE,
a non-profit corporation,

               Plaintiff,

      v.                                    No.  03:13-cv-00810-HZ

JEROME E. PEREZ, in his official
capacity as Oregon/Washington State
Director, BLM; UNITED STATES
BUREAU OF LAND MANAGEMENT,
an agency of the United States Government;
JANINE CLAYTON, in her official
capacity as Forest Supervisor of the Gifford
Pinchot National Forest; and UNITED
STATES FOREST SERVICE, an agency           OPINION & ORDER
of the United States Government,

               Defendants

and

ASCOT USA, INC. and ASCOT
RESOURCES LTD.,

               Intervenor-Defendant

1 - OPINION & ORDER

Tom Buchele
EARTHRISE LAW CENTER
10015 S.W. Terwilliger Blvd.
Portland, Oregon 97219

Roger Flynn
WESTERN MINING ACTION PROJECT
P.O. Box 349
Lyons, Colorado 80540

      Attorneys for Plaintiff

Dean K. Dunsmore
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
C/O Office of U.S. Attorney
222 W. 7th Avenue, #9, Room 253
Anchorage, Alaska 9951307567

Romney S. Philpott
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044

Stephen Odell
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

      Attorneys for Defendants

Per A. Ramfjord
Crystal S. Chase
STOEL RIVES LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204

      Attorneys for Intervenor-Defendant

HERNANDEZ, District Judge:

      In this environmental case, Plaintiff Gifford Pinchot Task Force challenges the issuance

2 - OPINION & ORDER

of a permit approving the Goat Mountain Hardrock Prospecting Project ("the Project").  Both

Defendant the Bureau of Land Management (BLM) and Defendant the United States Forest

Service (USFS) were involved in the decision approving the Project.  Named Defendants also

include Jerome Perez in his official capacity as Oregon/Washington State Director of the BLM,

and Janine Clayton in her official capacity as Forest Supervisor of the Gifford Pinchot National

Forest.  In a June 13, 2013 Order, I granted the motion to intervene by Ascot USA and its parent

company Ascot Resources (collectively "Ascot").

Plaintiff and Ascot move for summary judgment.  For the reasons explained below, I

grant the motions in part and deny them in part.

BACKGROUND

The agency actions challenged in this case authorize exploratory drilling on

approximately 900 acres of land within the Gifford Pinchot National Forest, in an area located

adjacent to the Mt. St. Helens National Volcanic Monument.  The 900 acres is within U.S.

Mineral Survey (MS) parcels 708, 774, 779, 1329, and 1330.  Admin. Rec. 240.[1]  The United

States holds full title and interest to 100% of the mineral estate of all of these parcels, except for

MS 708.  2012 EA, AR 1086-87.  The United States owns an undivided 50% mineral interest in

MS 708.  Id.  Thus, as to MS 708, the United States owns 100% of the surface estate and an

undivided 50% interest in the underlying mineral estate.  Ascot owns the other 50% of the

underlying mineral estate of MS 708.

---

[1]  The Administrative Record ("AR") consists of four DVDs, three of which were filed with the Court on September 30, 2013 (ECF #27), and contain pages AR 00001 - AR 26843. The fourth DVD was filed with the Court on December 4, 2013 (ECF #34) and contains supplemental pages Supp. AR 0001 - Supp. AR 2842.

The BLM, working with the USFS, issued an Environmental Assessment (EA) related to the Project on June 29, 2012, which was modified November 30, 2012 (the 2012 EA). 2012 EA, AR 1068-1279. The Project includes the drilling of a total of 63 rock core holes from 23 drill pads to collect rock core samples for analysis to obtain geological and mineralogical information. 2012 EA, AR 1084. Generally, it entails "reactivation" of approximately 1.69 miles of existing decommissioned roads, installation of drilling-related equipment, elimination of trees and other vegetation within and along the roads and at each drill site, and pumping of 5,000 gallons of ground water per day. 2012 EA, AR 1097-1111.

The diameter of the drill holes is relatively small at about 2.5 inches. 2012 EA, AR 1103. The total area disturbed by the drilling will be less than one-quarter acre. Id. The total area affected by the drilling, including reopened roads, is about 3.3 acres. Id. Portable rigs are used. 2012 EA, AR 1104. The rigs are operated 24 hours per day, 7 days for week, but less then 1 week in each specific location. 2012 EA, AR 1193.

After the 2012 EA was issued in November 2012, the USFS issued a Decision Notice (DN) and Finding of No Significant Impact (FONSI), on December 3, 2012. AR 821-40. The USFS's DN/FONSI documented the USFS's consent to the BLM for issuing two Federal Hardrock Mineral Prospecting Permits and specified certain required conditions for the use and protection of the National Forest System. USFS DN/FONSI, AR 821. The Project was then approved by the BLM in a Decision Record (DR) and separate FONSI on December 20, 2012. AR 240-263 (DR); AR 264-68 (FONSI). The USFS denied Plaintiff's administrative appeal on March 21, 2013. Supp. AR 2811-38. The USFS clarified that decision on April 2, 2013. Supp. AR 2839-42.

4 - OPINION & ORDER

Plaintiff challenges the USFS's DN/FONSI, the BLM's DR and FONSI, and the USFS's Appeal Decision, as well as the 2012 EA, upon which all of these other decisions were based. Plaintiff brings the following claims:

(1) violations of the Land & Water Conservation Fund Act (LWCF Act), the Reorganization Plan No. 3 of 1946, and the Weeks Act of March 1, 1911 and March 4, 1917, based on Plaintiff's contention that Defendants' approval of the Project is inconsistent with and interferes with the purposes for which the land was acquired and authorizes activities that will directly interfere with recreation on lands purchased with funds obligated to provide outdoor recreation to the public;

(2) violation of the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600–1687, by authorizing the Project without ensuring that the Project's activities will comply with applicable standards and guidelines set out in the Gifford Pinchot Land and Resource Management Plan, as amended by the Northwest Forest Plan; and

(3) violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347, by failing to prepare an Environmental Impact Statement (EIS), by failing to include a baseline groundwater analysis, by failing to address the synergistic and cumulative effects of the Project, by failing to provide any detailed analysis of mitigation measures and the effectiveness of each measure, and by failing to consider all reasonable alternatives.

Plaintiff seeks declaratory and injunctive relief as follows:  (1) vacating and setting aside the USFS's DN/FONSI, the BLM's DR and FONSI, the USFS's Appeal Decision, and the 2012 EA; (2) declarations that Defendants violated NEPA in all the ways that Plaintiff alleges; (3) enjoining Defendants from making any further decision or implementing any decision regarding

drill applications within the Gifford Pinchot National Forest unless and until Defendants comply

with NEPA, the NFMA, the LWCF Act, the Reorganization Plan, and the Weeks Act; and (4)

enjoining Defendants from allowing any further exploratory drilling within the Gifford Pinchot

National Forest until Defendants comply with those statutes.

STANDARDS

I. Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting

former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d

1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II.  The Administrative Procedure Act

The Ninth Circuit has endorsed summary judgment motions as "'an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'"  City & Cnty. of S.F. v. United States, 130 F.3d 873, 877 (9th Cir. 1997) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985)).

All of the claims in this case are governed by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (APA).  Under the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[:]  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedures required by law[.]"  5 U.S.C. § 706(2).

Under this standard,

an "agency must examine the relevant data and articulate a satisfactory explanation for its action."  Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed.2d 443 (1983).  An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law. Id.

Organized Village of Kake v. U.S. Dep't of Agric., 746 F.3d 870, 974 (9th Cir. 2014).

The court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014) (internal quotation marks omitted).  The court's "inquiry must be thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency.  Id. (internal quotation marks omitted). "Where the agency has relied on relevant evidence such that a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence.  Id. (internal quotation marks and brackets omitted).  "Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings."  Id. (internal quotation marks omitted).

Moreover, the court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise.  See Balt. Gas & Elec. Co.,  v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983).  It should not "act as a panel of scientists that instructs the [agency] . . ., chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty."  Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008) (en banc), overruled in other part as recognized by Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009).  The court should also "conduct a particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable."  Id. at 993 (internal quotation marks omitted).  And "'[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an

original matter, a court might find contrary views more persuasive.'" Id. at 1000 (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)).

DISCUSSION

I.  Standing, Exhaustion, & Final Agency Action

A.  Article III Standing

Defendants and Ascot do not dispute that Plaintiff has Article III standing to sue because its members have suffered, and will immediately suffer, injuries in fact that are fairly traceable to, and would thus be redressed by invalidation of, the BLM and USFS actions in this case, including the authorization of the permitted mineral operations on public lands. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180–81 (2000); see also Exs. 1, 2 to Pl.'s Mtn (Declarations of Jessica Schafer and Craig Lynch describing their use of the affected area and their concerns about the authorized activities).

B.  Exhaustion

The APA requires that plaintiffs exhaust administrative remedies before bringing suit in federal court. 5 U.S.C. § 704. "This requirement applies to claims under NEPA." Great Basin Mine Watch v. Hankins, 456 F.3d 955, 965 (9th Cir. 2006). "'Persons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.'" Id. (quoting Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004)).  The requirement also applies to claims under the NFMA. See Bark v. Larsen, No. 03:06-cv-01119-AS, 2006 WL 4852688, at *9-10 (D. Or. June 26, 2006) (explaining exhaustion requirement in context of a NFMA claim).  Neither party cites any law requiring administrative exhaustion of a

claim that a federal agency is violating the Weeks Act, the LWCF Act, or Reorganization Plan No. 3.

Ascot asserts that Plaintiff is unable to challenge any actions taken by the BLM because Plaintiff failed to exhaust its administrative remedies with respect to those actions. While Department of Interior regulations, which apply to the BLM, appear to require exhaustion, subject to certain exceptions, a 1997 case of Judge Haggerty's disposes of Ascot's argument.

In that case, the defendant argued that the plaintiff had failed to exhaust its administrative remedies and thus, could not maintain its action in district court, because although the plaintiff had appealed the BLM's decision to the Interior Board of Land Appeals (IBLA), the appeal was still pending. Or. Natural Desert Ass'n v. Green, 953 F. Supp. 1133, 1141-42 (D. Or. 1997). The plaintiff argued that exhaustion was not required under the applicable regulation. Id. Judge Haggerty agreed with the plaintiff, explaining that

> [u]nder the APA, judicial review of an agency's action is available when the challenged action is "final." 5 U.S.C. § 704. Under section 10(c), an action is final and subject to judicial review when the aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule. Id.; Darby v. Cisneros, 509 U.S. 137, 154, 113 S. Ct. 2539, 2548, 125 L. Ed.2d 113 (1992). The requirement that an aggrieved party exhaust administrative remedies, therefore, is limited to that which the statute or rule clearly mandates. Id. Further, in the event an agency rule requires appeal before review, the agency rule must also provide that the administrative action is made inoperative pending that review. Id.

> Here, the Department of Interior regulations do require exhaustion, 43 C.F.R. § 4.21(c), but the regulation does not render the [administrative action] inoperative pending IBLA review. 43 C.F.R. § 4.21(b). Rather, the aggrieved party is required to request a stay and make a compelling threshold showing to justify the stay. This process vests discretion in the IBLA to grant or deny a stay pending review. The requirement under the APA is unequivocal. As such, ONDA was not required to proceed with its appeal to the IBLA prior to seeking judicial review of the River Plan.

Id. at 1141-42.  The current regulation is the same now as when Judge Haggerty decided Green.

While the regulation "requires" exhaustion, the regulation still simultaneously requires that the

aggrieved party request a stay and make a compelling showing to justify the stay.  Thus, the

process vests discretion in the IBLA to grant or deny a stay pending review.  According to Judge

Haggerty, this is inconsistent with the APA's requirement that the agency rule must provide that

the challenged administrative action become inoperative pending review.  Id. at 1142.  As

Plaintiff in the instant case notes, to render the BLM's actions ineffective on appeal, Plaintiff was

required to seek a discretionary stay.  In contrast, states Plaintiff, the filing of an appeal under the

USFS regulations renders the challenged decision immediately ineffective and thus, those

regulations comply with the APA and exhaustion is required.  Plaintiff exhausted its

administrative remedies in regard to the USFS's decision and as explained in Green, Plaintiff was

not required to exhaust in regard to the BLM's decision.

C.  Final Agency Action

The APA allows judicial review of final agency action.  5 U.S.C. §§ 702, 704 (allowing

"[a] person suffering legal wrong because of agency action" to seek judicial review of such

action; "[a]gency action made reviewable by statute and final agency action for which there is no

other adequate remedy in a court are subject to judicial review.").  In its DN/FONSI, the USFS

gave its consent to the Project.  Defendants contend that the USFS's consent is not "agency

action" or "final agency action" and thus Plaintiff cannot challenge that consent here.

"Agency actions" are defined as "the whole or a part of an agency rule, order, license,

sanction, relief, . . . ."  5 U.S.C. § 551(13).  "Order" is the "whole or a part of a final disposition"

and "license" is "the whole or a part of an agency permit."  5 U.S.C. § 551(6), (8).  "Agency

action" also includes "'the equivalent or denial thereof [i.e., of an agency rule, order, license, sanction, or relief], or failure to act.'" Or. Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 983 (9th Cir. 2006) ("ONDA") (quoting S. Utah Wilderness Alliance v. Norton, 542 U.S. 55, 62 (2004)).

Defendants argue that the USFS's consent does not fit the definition of "agency action" because it is not a rule, a sanction, or an order, it is not a license or the functional equivalent thereof, and it does not grant relief to any person. Defendants maintain that in contrast to the actual permit issued by the BLM, the USFS's consent did not independently authorize Ascot to undertake any activity.

Defendants' argument fails to recognize that the definition of agency action in section 551(13) includes the whole or a part of an agency rule, order, license, sanction, etc. The definitions for each type of action also include a "part" of an action: for example, "the whole or a part of a final disposition" (order); 5 U.S.C. § 551(8); and "the whole or a part of an agency permit" (license); 5 U.S.C. § 551(6). And, agency action includes the "equivalent" of an agency rule, order, license, etc., or a failure to act. ONDA, 465 F.3d at 983; 5 U.S.C. § 551(13).

It is undisputed that the USFS's consent was a prerequisite for the BLM's issuance of the permits. Without seeking and obtaining the USFS's consent, the permits could not issue. Additionally, the BLM relied on the USFS's consent decision in issuing the permit, effectively incorporating the consent and the conditions into its own DR and FONSI. E.g., BLM DR, AR 240 ("I relied on [the USFS's] determination of plan conformance and its determination that prospecting activities will not interfere with the primary purposes for which the lands were acquired"); AR 241 (noting that under 42 C.F.R. § 3503.20(c), the USFS must decide whether to

consent to the BLM issuing the permits); AR 242 (noting that the USFS has provided specific stipulations as part of its consent and that the BLM's DR adopts those specified conditions "verbatim"); AR 243 (noting that one of four factors supporting its decision was the consent of the USFS); AR 259 (again noting that "I have relied on the written consent and determinations of the USFS" and additionally, "have incorporated all of the additional mitigation measures and stipulations provided by the USFS in its [DN/FONSI] dated December 4, 2012); AR 262 (in the section setting forth Administrative Remedies, the BLM explained the timing for when the BLM decision became effective under the pertinent regulations, then added: "However in this instance, the BLM decision includes reliance on the determinations and consent of the [Gifford Pinchot National Forest]").  In the face of its express reliance on the determinations and consent of the USFS, Defendants cannot deny that the USFS's consent was part of the permitting process and thus, is agency action within the meaning of the APA.

Defendants argue that even if the USFS's consent is "agency action," it is not "final agency action."  Two conditions are required for agency action to be considered "final" under the APA.  First, the action must be the "consummation of the agency's decision-making process" and "not be of a merely tentative or interlocutory nature."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997); see also ONDA, 465 F.3d at 982, 984 (the action must constitute a "definitive statement of the agency's position"; noting further that to satisfy the first prong of Bennett, the action must be the agency's last word on the matter) (internal quotation marks omitted).

Second, the action must be one which determines "rights or obligations" or from which "legal consequences will flow[.]"  Bennett, 520 U.S. at 178 (internal quotation marks omitted); see also ONDA, 465 F.3d at 987 (final agency actions "impose an obligation, deny a right, or fix

13 - OPINION & ORDER

*some* legal relationship as a consummation of the administrative process") (internal quotation marks omitted).

Defendants argue that the USFS's consent is not final agency action because while it arguably represents the consummation of the USFS's process, no legal consequences flow from it given that it was the BLM which had the authority to decide whether to issue the permits. See USFS DN/FONSI, AR 00823 (District Ranger stated that "[f]ollowing this FS consent decision, the BLM must decide whether to issue the prospecting permits and also whether to approve the exploration plan and associated activities within a smaller project area boundary."); see also Supp. AR 2813 (in addressing administrative appeal, USFS stated that "[t]he decision space of the Forest Service is very narrow in that the Forest Service granted consent to the BLM, who is ultimately responsible for issuance of the permits").

Defendants rely on Dalton v. Specter, 511 U.S. 462 (1994), where the Supreme Court addressed whether military base closure recommendations made by the Secretary of Defense and a special base closure commission were final agency actions within the meaning of the APA. The commission was to forward its recommendations, and the Secretary's, to the President who could then approve or disapprove the recommendations. If the President approved, then the President would tender a certification of approval to Congress. Id. at 470.

The Court held the recommendation reports were not final agency action:

The reports submitted by the Secretary and the Commission . . . carry no direct consequences for base closings. The action that will directly affect the military bases is taken by the President, when he submits his certification of approval to Congress. Accordingly, the Secretary's and Commission's reports serve more like a tentative recommendation than a final and binding determination. The reports are, like the ruling of a subordinate official, not final and therefore not subject to review.

14 - OPINION & ORDER

Id. at 469-70 (citation, internal quotation marks, and brackets omitted).

The Court emphasized the "importance of [the President's] role in the base closure

process. Id. at 470. "Without the President's approval, no bases are closed under the Act."

"[T]he Act, in turn, does not by its terms circumscribe the President's discretion to approve or

disapprove the Commission's report." Id. And, the Court stressed that the "core question" for

"determining finality" was "whether the agency has completed its decisionmaking process, and

whether the result of that process is one that will directly affect the parties." Id. (internal

quotation marks omitted). The Court noted that "[w]hat is crucial is the fact that the President,

not the Commission, takes the final action that affects the military installations." Id. (internal

quotation marks and brackets omitted)

Defendants argue that here, as in Dalton, the ultimate action permitting the Project is not

the USFS's consent, but the decision of the BLM. They contend that it is a BLM decision, not a

USFS decision. Thus, the USFS's consent decision carries "no direct consequences."

I agree with Plaintiff that Dalton is distinguishable. As noted above, the USFS's consent

is a prerequisite to the BLM's legal authority to issue the permit. Thus, in contrast to Dalton, the

USFS's consent does circumscribe the BLM's discretion to approve the permit. Unlike in Dalton,

the BLM was statutorily required to obtain the USFS's consent and determination that the mining

activities would not interfere with the primary purpose of the lands' acquisition. While the BLM

ultimately had the power to make the decision whether to grant the permit request, it could not do

so without incorporating the USFS's determinations. Thus, the USFS's consent was not like a

recommendation from a subordinate; it was a condition required by an equal agency partner.

Additionally, legal consequences flow from the imposition of the seven specific,

mandatory conditions by the USFS in its consent decision.  USFS DN/FONSI, AR 837-38.  The

permit issuance, by the BLM, although subsequent in time to the USFS's DN/FONSI consent

decision, had to include these requirements and any violation of the conditions is a violation of

the permit.  Thus, the USFS's consent altered the legal landscape because first, the BLM could

not issue the permit without it and second, it contained conditions imposed on Ascot.  As a

result, the consent decision was final agency action within the meaning of the APA.[2]

II.  Weeks Act, Reorganization Plan No. 3, and the LWCF Act Claims

    A.  Regulatory Scheme

    The USFS acquired the Project lands under the authority of the "Weeks Act" which

authorizes the Secretary of Agriculture to "examine, locate, and purchase such forested, cut-over,

or denuded lands within the watersheds of navigable streams as in his judgment may be

necessary to the regulation of the flow of navigable streams or for the production of timber."  16

U.S.C. § 515.  When first enacted in 1911, the Weeks Act addressed the protection of watersheds

of navigable streams and timber production.  In 1917, it was amended to authorize the Secretary

of Agriculture to permit mineral development of Weeks Act lands.  16 U.S.C. § 520.

Reorganization Plan No. 3 of 1946 transferred the authority over mineral development to the

Secretary of the Interior, provided, however, that the Secretary of Agriculture advises that

mineral development activities do not interfere with the primary purposes for which the lands

were acquired.  That law states that

    [t]he functions of the Secretary of Agriculture and the Department of Agriculture

---

    [2]  Further, while the BLM issues the permits, the substantive part of the permit is the
USFS's consent.  If the USFS's consent is not final agency action, it is then unreviewable.  This is
an untenable position.

with respect to the uses of mineral deposits in certain lands pursuant to the provisions of the [Weeks Act and other statutes], are hereby transferred to the Secretary of the Interior and shall be performed by him or, subject to his direction and control, by such officers and agencies of the Department of the Interior as he may designate: *Provided*, That mineral development on such lands shall be authorized by the Secretary of the Interior only when he is advised by the Secretary of Agriculture that such development will not interfere with the primary purposes for which the land was acquired and only in accordance with such conditions as may be specified by the Secretary of Agriculture in order to protect such purposes.

5 U.S.C. App 1 (Reorganization Plan No. 3 of 1946, § 402) (hereinafter "Reorganization Plan").

Thus, under the Reorganization Plan, the BLM may approve mineral prospecting and development on Weeks Act land so long as the USFS advises that such activities will not interfere with the purposes for which the lands were acquired.

While the Project lands were acquired under the authority of the Weeks Act, they were purchased in 1986 with money appropriated under the LWCF Act.[3]  See May 13, 1986 Memo. fr. Rodney Young, Acting Director of Lands, USDA, to Regional Forester R-6, AR 25653 (regarding purchase of the lands from Trust for Public Land and noting "Funds [for the purchase] are Land and Water Conservation Fund Act moneys.").

Lands purchased by the USFS with LWCF Act funds must be "primarily of value for outdoor recreation purposes."  16 U.S.C. § 460*l*-9(a)(1)(b).  Congress stated the purpose of the Act as follows:

The purposes of this part are to assist in preserving, developing, and assuring accessibility to all citizens of the United States of America of present and future generations and visitors who are lawfully present within the boundaries of the

_____

[3]  At oral argument, Defendants noted, for the first time, that not all of the lands were acquired with LWCF Act funds.  Rather, only MS parcels 1329 and 1330 were purchased with LWCF Act money.  Neither party nor Ascot contended that this fact was relevant to my legal analysis of the claims and thus I do not address it further.

United States of America such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of the citizens of the United States by (1) providing funds for and authorizing Federal assistance to the States in planning, acquisition, and development of needed land and water areas and facilities and (2) providing funds for the Federal acquisition and development of certain lands and other areas.

16 U.S.C. § 460*l*-4.

In regard to the Project lands, the USFS stated in letters sent to the relevant Washington congressional delegation and local county commissioners in February 1986 in connection with the purchase of the lands, that "[a]cquisition of this property by the United States will aid in the preservation of the integrity of the Green River prior to its entering the National Volcanic Monument, and will also aid the preservation of the scenic beauty of this area which is to become an important Monument portal."  AR 25672; see also AR 23033 (prior 2007 EA which noted the letters and other evidence regarding the purpose of the purchase of the lands and stating that "[b]ased on the foregoing the explicit purpose of the USFS acquisition was to protect the Green River.").

B.  Statutory Restrictions on Purchase and Later Manner of Use

Generally, Plaintiff contends that the 2012 EA and the USFS's DN/FONSI fail to articulate the primary purposes for which the Project lands were acquired.  Additionally, to the extent the primary purposes are recognized, Plaintiff argues that the 2012 EA does not support the agencies' conclusion that the permitted mining activities are not inconsistent with those primary purposes.  Defendants and Ascot argue that while the statutes at issue limited the authority to acquire the lands to certain primary purposes or specific conditions, there is no support for Plaintiff's contention that after acquisition, any authorized use of the land can be only

18 - OPINION & ORDER

for or consistent with the purposes for which the lands were acquired. Defendants and Ascot also argue that in any event, the 2012 EA supports the agencies' conclusion that the Project is not inconsistent with those purposes.

I agree with Plaintiff that the "primary purposes for which the lands were acquired" controls not just the initial acquisition of the lands, but the manner of their development post-acquisition. The plain language of the Reorganization Act makes clear that the manner in which the lands are used after purchase must be consistent with the primary purposes for which the lands were acquired. Congress transferred functions "with respect to the uses of mineral deposits in certain lands pursuant to the provisions of the [Weeks Act and other statutes]" from the Secretary of Agriculture to the Secretary of the Interior, and then made clear "[t]hat mineral development on such lands" could be authorized by the Secretary of the Interior only when the Secretary of Agriculture advises "that such development will not interfere with the primary purposes for which the land was acquired and only in accordance with such conditions as may be specified by the Secretary of Agriculture in order to protect such purposes." 5 U.S.C. App 1, § 402 (emphasis added). Because the Reorganization Plan begins with a reference to "mineral deposits" which is an obvious reference to subsurface minerals, the references to "mineral development" and "such development" clearly refer to the development of those mineral deposits. The only rational way to interpret the language is that the Reorganization Plan's references to "mineral development" and "such development" are to prospective activity, meaning mineral development that has not yet occurred. It refers to future development of the deposits that are in the lands.

Additionally, the use of the word "was" supports this conclusion. Congress referred to

"such development," meaning "mining development," and directed that it not interfere with the primary purposes "for which the land <u>was</u> acquired," referring to the past action of acquiring the land.  The Reorganization Plan thus necessarily contemplates actions at two different times:  the land <u>was</u> acquired for specified purposes at some point in the past, followed by later mineral development.  By requiring the Secretary of Agriculture to "advise" about "such development" after purchase, the Reorganization Plan imposes a continuing duty on the Secretary to oversee that the statutory requirements are met.

Defendants and Ascot do not appear to seriously argue that the Project may go forward if it is inconsistent with the primary purposes of the Weeks Act.  The relevant agency documents all expressly note that requirement.  2012 EA, AR 1091; USFS DN/FONSI, AR 823; BLM DR, AR 240, 259 (relying on USFS DN/FONSI); USFS App. Dec., Supp. AR 2811, 2820-24 (relying on USFS DN/FONSI and further addressing concern of whether the permitted prospecting activity is inconsistent with the purposes for which the land was acquired).

Instead, Defendants and Ascot vigorously contend that the LWCF Act, in contrast to the Weeks Act, does not require that the agencies expressly determine that the proposed Project is not inconsistent with the purpose of outdoor recreation.  In particular, Ascot noted at oral argument that if Congress had wanted the LWCF Act's primary purpose of outdoor recreation to be considered by the Secretary of Agriculture under the Reorganization Plan's directive, Congress should have amended the Reorganization Plan at the time it passed the LWCF Act.  Without such amendment, Ascot argues, the USFS's consent as to LWCF Act primary purposes is not required before mining development may occur on Weeks Act land.

I disagree with Defendants and Ascot.  First, the LWCF Act uses language suggesting

that the purposes are to be applied prospectively to development on LWCF Act purchased land.
The statute states that the "purposes of this part are to assist in preserving, developing, and
assuring accessibility to all citizens . . . of present and future generations . . . such quality and
quantity of outdoor recreation  . . . by . . . providing funds for the Federal acquisition and
development of certain lands and other areas."  16 U.S.C. §460*l* -4.  Defendants' argument is
irreconcilable with the statutory language expressing that a purpose of the acquisition is to
preserve and develop accessibility to outdoor recreation for future generations by providing funds
for the development of certain lands.

Second, clearly the LWCF Act itself is not cited by the Reorganization Plan which was
passed decades earlier.  But, the Reorganization Plan generally refers to the "primary purposes
for which the land was acquired" and does not restrict those primary purposes to protection of
navigable stream flows and timber production.  Thus, while the Reorganization Plan makes clear
that the Secretary of Agriculture must consent when there is proposed mineral development on
lands purchased under the authority of the Weeks Act, it refers more generally to the "primary
purposes" without specifying them.  When stating what the Secretary of Agriculture must consent
to, it refers to the "primary purposes for which the land was acquired" without restricting that
"advise" to the development's lack of interference with navigable stream flow or timber
production.

The fact that Congress did not expressly delineate the purposes supports the position that
Weeks Act lands purchased with LWCF Act funds have multiple primary purposes, namely
protecting navigable stream flow, timber production, and outdoor recreation.  The purpose for
which the funds are appropriated is properly considered along with the purposes of the authority

under which the lands are acquired.  I agree with Plaintiff that the intersection of the three statutes means that outdoor recreation must be considered by the USFS along with the protection of navigable stream flow and timber production.

Any other construction of the statutes would render the LWCF Act meaningless, violating an elementary canon of statutory construction.  See, e.g., United States v. Andrews, 600 F.3d 1167, 1173 (9th Cir. 2010) (noting the "longstanding canon of statutory construction" that statutory terms should not be construed in a way to render a provision of the statute "meaningless or superfluous"); In re Cervantes, 219 F.3d 955, 961 (9th Cir. 2000) (court must reject "interpretations that would render a statutory provision surplusage or a nullity).  If Defendants and Ascot prevailed on their argument, the subsequent development of land purchased under the LWCF Act could completely undermine the Congressionally stated primary purpose for the purchase of such land, rendering it meaningless.  Such an argument is unsupportable.[4]

C.  Assessment of Primary Purposes of Acquisition in the 2012 EA

1.  Weeks Act Purposes

Plaintiff argues that the 2012 EA improperly considers mining to be a primary purpose for which the lands were acquired and insufficiently addresses the effects of the Project on protecting navigable stream flows and timber management and therefore, the USFS's consent must be set aside.  Defendants and Ascot contend that the 2012 EA properly recognized the Weeks Act acquisition purposes and that the 2012 EA provides more than adequate support for

---

[4] Plaintiff appears to suggest that the USFS was required to consider other purposes in assessing the Project's proposed mineral development.  Plaintiff refers to scenic beauty and wildlife and cites to correspondence generated contemporaneously with the 1986 purchase of the lands as the sources of those purposes.  For the reasons articulated by Defendants and Ascot, I do not find those purposes controlling.

the USFS's determination that the Project is not inconsistent with those purposes. I agree with Defendants and Ascot.

The 2012 EA contains a section entitled "Primary Purpose for Which the Lands were Acquired." 2012 EA, AR 1091. There, the 2012 EA acknowledges that the lands were acquired under the statutory authority of the Weeks Act which authorized the Secretary of Agriculture to purchase lands for the purposes of regulating the flow of navigable streams or for the production of timber. Id. The 2012 EA also notes that the 1917 amendments allowed mineral activities on lands acquired under the Weeks Act. Id. The 2012 EA quotes from letters sent in 1986, at the time of the acquisition of the lands, from the USFS to congressional representatives and local county commissioners that the purchase of the lands "will aid in the preservation of the integrity of the Green River prior to its entering the National Volcanic Monument, and will also aid in the preservation of the scenic beauty of this area which is to become an important Monument portal." Id. (internal quotation marks omitted)

The USFS's DN/FONSI recognizes the Weeks Act acquisition purposes and affirmatively states that the adoption of Alternative 3 along with specified conditions issued by the USFS will allow activities which will not interfere with the primary purpose for which the lands were acquired under the Weeks Act. USFS DN/FONSI, AR 821, 822, 823, 834; see also AR 825 (noting that in reviewing the comments received on the 2012 EA, a hard look at several specific issues regarding the Project, including the purposes for which the lands were acquired, was performed). The BLM's DR states that it relied on the USFS's DN/FONSI determination that prospecting activities will not interfere with the primary purposes for which the lands were acquired. BLM DR, AR 240, 259. Finally, the USFS's Appeal Decision refers to the USFS's

DN/FONSI finding that the permitted activities were consistent with the purposes for which the lands were purchased.  Supp. AR 2811; see also id. at 2820-24.

There can be no serious dispute that the 2012 EA and the USFS's DN/FONSI expressly state that protection of navigable stream flows and timber production were the primary purposes of the acquisition of the land.  The 2012 EA also referred to the 1986 statement about protecting the Green River, an acknowledgment of that river's importance.  2012 EA, AR 1091.  The discussion of the Project's impacts on hydrology also makes express reference to the proposed area's location as the upper Green River watershed.  2012 EA, AR 1116.  The fact that the 2012 EA mentions various statutes that permit mining activity on USFS land does not diminish the importance of protecting navigable stream flows or timber production as primary purposes for the land's acquisition, nor does it elevate mining to a primary purpose for the purchase of the land.  The 2012 EA and the other relevant documents appropriately recognized protection of navigable stream flows, and the Green River watershed in particular, and timber production as the primary purposes for which the Project lands were acquired.

Section 3 of the 2012 EA contains more than 100 pages of analysis of the effects of the Project on several distinct environmental factors, including hydrology and hydrogeology of both surface water and groundwater, AR 1116-31, visual and scenic resources, AR 1177-82, and recreation.  AR 1190-96.  See generally 2012 EA, AR 1112-1203.  The USFS in its DN/FONSI and the BLM in its DR adopted "Alternative 3," described in the 2012 EA as the "Alternative Based on Scoping Comments."

The hydrology/hydrogeology section is approximately fifteen pages.  There, the 2012 EA addresses the environmental effects of both the Proposed Action and Alternative 3 on hydrology

and hydrogeology, specifically addressing the direct effects, the indirect effects, and the cumulative effects. AR 1121-27. The 2012 EA hydrology/hydrogeology section also contains subsections addressing surface water impact avoidance and minimization measures, aquatic and riparian conservation strategy (ACS) guidelines, and groundwater impact avoidance and minimization measures. AR 1128-31.

As to timber production, the 2012 EA mentions the number of trees that would be removed in the discussions of wildlife and vegetation. AR 1146, 1166. The 2012 EA finds that no more than sixty-eight trees will be removed and thus, the proposed activity does not limit the availability of timber. 2012 EA, AR 1165-66; 2012 EA, App. C, AR 1236 (Comments 16-18) ("The proposed prospecting activities will require the removal of no more than 68 trees from mature stands. . . .The removal of trees from younger stands will be limited given that the total disturbed area for all of the drill pads will be approximately 0.23 acres and that the total disturbed area for road reactivation will be approximately 3.3. acres, 2.45 acres of which were reactivated in 2010").

The responses by the agencies to public comments contain further statements and explanations as to why the proposed permits would not interfere with the primary purposes for which the land was acquired. 2012 EA, App. C, AR 1236-40 (Comments 15-23, 26-29), AR 1242 (Comments 36-38).

In support of its position that the 2012 EA does not support the determination that the Project is consistent with the protection of navigable stream flows, Plaintiff cites to two cases which Ascot argues are distinguishable. Neither case is especially helpful to either side in the instant dispute because the tribunals involved in those cases looked closely at the facts in making

their respective determinations.  In <u>Henry N. Gerritsen</u>, 3 IBLA 90, 92, 1971 WL 12338 (IBLA 1971), the IBLA did not conclude that mining activity is by definition inconsistent with the purposes for which Weeks Act land was acquired.  Instead, the IBLA looked at how the land was currently managed, its location, its steepness, and other factors, and concluded that the mining activity could not be allowed.  In the other case, the Seventh Circuit also did not hold that as a matter of law, mining is inconsistent with the purposes for which Weeks Act land was acquired. <u>Downstate Stone Co. v. United States</u>, 712 F.2d 1215, 1217 (7th Cir. 1983).  The court noted that the proposed limestone quarry project would have removed the face of a forested hillside and precluded the productive use of the surface by the United States.  <u>Id.</u>  Given that the cases are fact-specific, they do not provide meaningful support to either side in this case.

I have reviewed the 2012 EA as well as the other documents, and have carefully reviewed Section 3 of the 2012 EA with particular attention to the hydrology/hydrogeology section as it relates to the Weeks Act challenge by Plaintiff.  Based on my review, I conclude that the USFS's consent determination that the Project is not inconsistent with Weeks Act purposes is not arbitrary and capricious.

Under the APA, the "agency must examine the relevant data and articulate a satisfactory explanation for its action[.]"  <u>Motor Vehicle Mfs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983).  The court gives deference to the agency's decisionmaking and even if the evidence is capable of more than one rational interpretation, the court must uphold the agency's findings.  <u>San Luis & Delta-Mendota Water Auth.</u>, 747 F.3d at 601; <u>see</u> also <u>Lands Council</u>, 537 F.3d at 993 (court's review of an agency's "predictive judgments about areas that are within the agency's filed of discretion and expertise" should be "particularly deferential" as long

as those judgments are reasonable) (internal quotation marks omitted).

The determination that the Project will not interfere with timber production is supported by the facts noted in the 2012 EA that there will be no more than sixty-eight trees removed from mature stands throughout the almost 900 acres involved in the Project and that the removal of younger trees is limited by the small number of acres involved in the drill pads (0.23 acres) and road reactivation (3.3 acres).

Admittedly, the determination regarding navigable stream flow involved a more complicated assessment of hydrology.  Nevertheless, the 2012 EA analyzed the Project's effects on stream distribution, water temperature, flow regimes, riparian habitat, wetland potential, and floodplains, and considered the potential for impacts to surface waters from road crossings, erosion, and sediment delivery to streams.  2012 EA, AR 1116.  The direct effects of Alternative 3 to surface waters, riparian habitat, stream distribution, water temperature, flow regimes, wetland potential, and floodplains was noted to include an increased potential for erosion and sedimentation.  2012 EA, AR 1126.  However, sedimentation controls consistent with applicable erosion control measures and Best Management Practices (BMPs) were required.  Id.; see also 2012 EA, AR 1121-22 (discussing direct effects of the Proposed Action and noting the low risk of erosion of the "in-place" soils, and the higher possibility for "[s]ide cast soil" but noting the sedimentation controls which would be used).  Water bars are required to be established along roads in the Project area to prevent erosion and temporary culverts would be installed in areas with seasonal drainages.  2012 E, AR 1102-03.  Silt screens are to be installed at the outfall of the culverts along with weed-free straw bales for filtration.  Id.  Weed-free straw would also be placed on the road to minimize erosion.  Id.

27 - OPINION & ORDER

The 2012 EA also discussed the impact of the Project on the flow of the Green River, noting fourteen years of flow data records.  2012 EA, AR 1124.  The 2012 EA explained that given that the water use for the Project represented "fractions of a percent of allocated and available water within the watershed, . . . the effects of water withdrawal are expected to be negligible."  Id.  In a separate subsection, the 2012 EA discussed surface water impact avoidance and mitigation measures, noting the measures adopted to (1) minimize sedimentation or erosion; (2)  control drilling fluids, petroleum products, and hazardous substances; and (3) protections for in-stream work.  2012 EA, AR 1128.  Finally, it is important to note that the Project is temporary.

The 2012 EA contains a detailed analysis of the relevant environmental effects of the Project on navigable stream flow.  Applying the appropriate deferential standard of review here, the 2012 EA supports the USFS's consent determination because the agency examined the relevant data and articulated a satisfactory explanation for why the Project is not inconsistent with the Weeks Act purposes for which the land was acquired.

2.  LWCF Act Purpose

Although the 2012 EA refers to the 1986 correspondence's recognition that purchase of the land would aid in the preservation of scenic beauty, 2012 EA, AR 1091, and recognized, in response to public comments that the lands were acquired because they were considered to have important resource values for recreation, 2012 EA, App. C, AR 1238, the 2012 EA does not expressly recognize outdoor recreation as a primary purpose of the land acquisition.  Similarly, the USFS's DN/FONSI does not discuss recreation as a purpose for which the lands were acquired.

Regardless of the lack of such express recognition, Section 3 of the 2012 EA discusses

28 - OPINION & ORDER

the Project's environmental impacts on visual and scenic resources, recreation, and noise.  It makes various findings of some impact,[5] but concludes that the impacts are negligible.[6]  See 2012 EA, AR 1195 (concluding that impacts from the drilling would be limited, temporary, and of "a nature that would not permanently impair recreation in the Project Area.").

While the 2012 EA supports the agencies' determination that the Project's impact to outdoor recreation is likely to be minimal and transient, this determination cannot satisfy the Reorganization Plan's requirement that the Secretary of Agriculture determine that the proposed activity is not inconsistent with the primary purpose of the land.  The context in which the environmental assessment is made is relevant and a finding that the environmental impact is negligible is not equal to a finding that the Project is not inconsistent with the primary purpose of

---

[5]  Plaintiff points to the following statements in the 2012 EA:  (1)  drilling will cause some visual and noise disturbances; AR 1177-82; (2) drilling would be seen by some forest users; AR 1180; (3) drill pads around the Green River Horse Camp and FS Road 2612 would be fenced and noisy; AR 1105; (4) visual impacts to campsites located in the vicinity of the horse camp near Drill Pads 6 and 7; AR 1180; (5) noise could reduce the opportunity for solitude in the immediate vicinity of each individual drill pad during active operations; AR 1193; and (6) noise from the drilling may be an issue, especially on weekends for the Green River Horse Camp; AR 1193.

[6]  As noted by Ascot, the 2012 EA finds that:  (1) "all recreational activities [within the nearly 900-acre project area] would continue [during the proposed activity], except within the immediate vicinity of the proposed drill sites"; AR 1193; (2) noise effects would occur at one drill pad at a time and less than a week for each drill pad, and would be temporary in that the noise effects would last only as long as the exploration was scheduled (3-4 months), and would cease immediately upon completion of the Project; Id. (3) primary recreational uses of the project area (Green River Horse Camp, Green River Trail #213, Goat Mountain Trail #217) will remain open to the public during the proposed activity; AR 1191-92, 1193; (4) timing of the drilling in the areas closest to the Green River Horse Camp is restricted to avoid drilling during periods of heavy recreational use; AR 1195; and (5) specific recreation mitigation measures would "prevent impairment of recreation and undue or unnecessary degradation of the land and associated resources"); AR 1996; 2012 EA, App. 5, AR 1277-78 (identifying six specific mitigation measures related to recreation).

outdoor recreation.  While I agree with Ascot that the LWCF Act does not require that the land

be used exclusively for outdoor recreation, and while the requisite finding could possibly be

inferred from the 2012 EA, the law requires an express determination by the Secretary of

Agriculture.  Because that is lacking here, the UFSF's consent is arbitrary and capricious in

regard to the LWCF Act purpose of outdoor recreation.

In summary, the primary purposes for which the land was acquired are timber production,

protection of navigable stream flow, and outdoor recreation.  The agencies made an express

determination that the primary purposes are timber production and protection of navigable stream

flow.  Their determination that the Project is not inconsistent with those two purposes is not

arbitrary and capricious.  However, the agencies failed to recognize outdoor recreation as a

primary purpose.  Their failure to do so and resultant failure to make an express determination

that the Project is not inconsistent with the purpose of outdoor recreation is contrary to the

requirements of the governing law and thus, is arbitrary and capricious.

III.  NFMA Claim

Under the NFMA, each national forest must "develop a comprehensive land and resource

management plan" for each unit in the national forest system.  Great Old Broads for Wilderness

v. Kimbell, 709 F.3d 836, 850-51 (9th Cir. 2013) (citing 16 U.S.C. § 1604(a)).  "Forest Plans aim

to balance environmental and economic concerns, while furthering the NFMA's purpose to

provide for diversity of plant and animal communities in national forests." Id. at 851 (internal

quotation marks omitted); 16 U.S.C. § 1604(g)(3)(B).  After the Forest Plan is implemented, "the

NFMA prohibits site-specific activities that are inconsistent with the governing Forest Plan." Id.;

see also Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957, 966 (9th Cir. 2002) ("All site

specific actions must be consistent with adopted forest plans"); Neighbors of Cuddy Mtn. v. Alexander, 303 F.3d 1059, 1062 (9th Cir. 2002) ("[s]pecific projects . . . must be analyzed by the Forest Service and the analysis must show that each project is consistent with the plan").  The USFS's "interpretation and implementation of its own forest plan is entitled to substantial deference."  Great Old Broads, 709 F.3d at 850 (internal quotation marks omitted).

The Forest Plan for the Gifford Pinchot National Forest was adopted in January 1990. AR 1089, 25182-84.  It was amended in 1994 by the regional Northwest Forest Plan (NWFP). AR 1089.  As amended, the Forest Plan provides management direction for the entire Gifford Pinchot National Forest, including the lands at issue in the permit applications.  AR 26124, 24735.  The Forest Plan includes the adoption of the Aquatic and Riparian Conservatory Strategy (ACS) and identification of objectives to maintain and restore the health of aquatic systems, including riparian areas.  Id.[7]  As a component of the ACS, the Forest Plan designates "riparian reserves," which include lands along permanently-flowing streams, lakes, wetlands, as well as intermittent streams in the Forest.  AR 24738, 26125.  On riparian reserve-designated lands, riparian dependent resources receive primary emphasis, and special standards and guidelines apply.  AR 24738.  Certain of these standards relate to mineral development in the forest. Plaintiff argues that the Project is inconsistent with two of the specific standards applicable to

---

[7]  The Ninth Circuit has explained that the NWFP contains the ACS, the "purpose of which is to protect fish habitat and to maintain or restore riparian and aquatic ecosystems." Siskiyou Reg. Educ. Project v. U.S. Forest Serv., 565 F.3d 545, 551 (9th Cir. 2009)  "The ACS designates certain streams in the forest as riparian reserves, portions of watersheds where riparian-dependent resources receive primary emphasis."  Id.  "To implement this strategy, the [NWFP] contains standards and guidelines that address matters such as timber management, road construction, grazing, and restoration."  Id.  "These binding standards and guidelines restrict certain activities within areas designated as riparian reserves or key watersheds."  Id. (internal quotation marks and ellipsis omitted).

mineral development:  MM-2 and MM-3.

    A.  MM-2

MM-2 provides:

Locate structures, support facilities, and roads outside Riparian Reserves.  Where no alternative to siting facilities in Riparian Reserves exists, locate them in a way compatible with Aquatic Conservation Strategy objectives.  Miles of road construction will be kept to the minimum necessary for the approved mineral activity.  Such roads will be constructed and maintained to meet roads management standards and to minimize damage to resources in the Riparian Reserves.  When a road is no longer required for mineral or land management activities, it will be closed, obliterated, and stabilized.

AR 24766.

    Drill Pads 6 and 7 are located within Riparian Reserves.  2012 EA, AR 1090 (noting that "[t]wo of the proposed drill pads (Pads 6 and 7) are within designated NWFP Riparian Reserves"); Supp. AR 2817 (noting that the 2012 EA "describes Pads 6 and 7 as being within riparian reserves"); see also 2012 EA, App. A, AR 1219 (map of project facilities showing riparian reserves).

    Drill pads are approximately 20 feet x 20 feet, or roughly 400 square feet.  2012 EA, AR 1101.  Trees growing on the roads would be removed and saved for reclamation to be placed as down woody debris, while trees along road edges would be limbed only to the extent necessary to avoid job hazards.  Id.  No trees greater than 12 inch diameter-at-breast-height (dbh) would be removed, with the possible exception of hazard trees.  Id., AR 1102.

    The Project will use one or two small track-mounted, self-propelled hydraulic diamond drill rigs.  Id., AR 1104.  When unfolded at the drill pads, the drill rigs have an outside dimension of about 16 feet x 16 feet.  Id.  The drill rig is equipped with hydraulic-powered leveling

equipment to reduce the amount of ground leveling required at each site.  Id., AR 1105.

Drilling equipment will be surrounded by a framed and tarpaulin-covered drill shack, approximately 16 feet x 16 feet.  Id., AR 1104.  Its purpose is to "attenuate noise, shade light, and protect drill operators from inclement weather."  Id.; see also id., AR 1111 (describing drill shacks under Alternative 3 to include baffles or insulation, noting that baffling would minimize intrusion to areas surrounding each drill site; also noting that to reduce impacts from operating lights, lighting would be shielded and directed toward the drill).  Several pieces of smaller equipment including a diesel generator and various pumps and tools, are to be housed within, or positioned next to the drill shack.  Id., AR 1104.

During drilling, fluids are introduced to keep the holes open, cool the drill bit, and circulate to the ground surface to remove drill cuttings.  Id., AR 1105.  Under Alternative 3, drilling fluid additives would be required to meet NSF/ANSI 60-2003 standards, as approved by the agencies, for use in potable water supply wells to protect human health and the environment should drill holes encounter permeable zones and groundwater systems.  Id., AR 1109.

Additionally:

> Drilling operations would be optimized to promote return of drill cuttings to minimize cutting distribution into adjacent formations, and to seal water bearing and porous formations to reduce cross-aquifer flow of groundwater. . . .
>
> Drilling fluid would be reused to the extent possible to minimize water use. Appropriately sized sumps lined with impermeable liner and/or tanks would be used to contain recyclable drilling fluids.  Sumps and/or tanks would be required to be placed within currently defined drill pads, or at an alternate location approved by the Agencies.  Remaining drilling fluid decant water, at the completion of drilling, would be infiltrated through an enviro-mat at the ground surface within the respective drill pad; solid materials such as cuttings would be appropriately disposed of off-site.

33 - OPINION & ORDER

Id.

As I understand this provision, the recyclable drilling fluid is placed in "appropriately sized sumps" which have been lined with an impermeable liner, or alternatively in tanks, and at the completion of drilling, remaining drilling fluid is decanted and then infiltrated through an enviro-mat at the ground surface, while the solid materials such as drill cuttings are disposed of off site.  The sumps are approximately 4 feet x 6 feet in width, and 2 feet x 4 feet deep and are to be installed within the existing road prism and next to the drill hole at each drill pad site.  Id., AR 1105.  The "drilling spoils" collected in the sumps are a mix of drill muds and rock cuttings that are generally very fine in grain size.  Id.  Under Alternative 3, the sumps are to be monitored by agency personnel to ensure they adequately hold drill cuttings.  Id., AR 1111.

Water is to be locally obtained from two preexisting holes:  Duval Hole 06 and MM-10-10.  Id., AR 1106.  Under the Proposed Action, the water is to be supplied to the drill sites by gravity feed or by a small diesel pump placed near the water source, with pressure hoses supplying water to drill sites up to 1,000 - 2,500 feet away.  Id.  Under Alternative 3, use of water from those holes is limited to 5,000 gallons of groundwater per day unless an appropriate water right or use permit is obtained from the Washington State Department of Ecology.  Id., AR 1109.  Water will be supplemented as necessary by purchase from regulated potable water sources.  Id.  A temporary water storage tank is to be placed at the Project site and filled with the off-site purchased water.  Id.  Use of the water storage tank on-site would increase water truck traffic on local roads.  Id.

Upon completion of drilling at each drill hole, the drill hole is to be sealed generally as described in the Washington State Department of Natural Resources's fact sheet entitled "Mineral

34 - OPINION & ORDER

Exploration Well/Drill Hole Plugging and Abandonment." Id.; AR 1110.  Sealing of the holes

involves a ten-foot cement surface plug placed within the top twenty feet of each drill hole to

help ensure an adequate surface seal.  Id.  Portland concrete cement mixed with clean water and

aggregates, or cement mixed with clean water, is to be used for the surface plug.  Id.

The 2012 EA concluded, in discussing the Proposed Action, that "[r]iparian impacts will

be minor."  Id., AR 1122.  It notes that some tree clearing, of less than 12-inch dbh, and minor

removal may occur at Drill Pads 6 and 7.  Id.  Road reactivation and drilling would be consistent

with ACS objectives and comply with the Minerals and Road Management Standards and

Guidelines established for riparian reserves in the Forest Plan.  Id.  The limited impact to upland

vegetation and the few trees cleared relative to the existing forest cover would have minimal

potential to alter temperature conditions or otherwise affect nearby by streams.  Id.  Under

Alternative 3, the direct effects of the Project to riparian habitat are similar to those for the

Proposed Action.  Id., AR 1124.

Plaintiff raised the MM-2 argument in its administrative appeal to the USFS.  In response,

the USFS explained in its March 21, 2013 Appeal Decision that

> [b]ecause of the narrow Forest Service decision space [referring to the consent
> decision], the [USFS] DN articulates that certain mitigations will be brought
> forward as recommendations to the BLM for inclusion in the prospecting permit
> or as terms of exploration plan approval.  These were included the BLMs
> Decision Record at 3.  The other mitigations outlined in the EA, such as Appendix
> F which includes mitigation measure MM-23, offers guidance to locate structures
> outside of riparian reserves, and minimizes effects to aquatic and other riparian
> dependent resources.  Furthermore, the EA describes Pads 6 and 7 as being within
> riparian reserves.  The effects of using these pads for exploration are limited to
> removal of some trees less than 12 inches in dbh on a 20 by 20 foot area for each
> pad.  EA at 18.  The ACS objectives have been met for permit issuance.  EA at
> 45-48.  Existing roads should be maintained to minimize damage to aquatic and
> riparian resources.  EA Appendix F at 3. As such, the issuance of consent by the

> Forest Service complies with MM-2 because of the mitigations adopted by the
> BLM in their decision record.  BLM DR at 3.

Supp. AR 2817.  In the April 2, 2013 Appeal Decision Clarification, the USFS stated that the

> selected alternative is compliant with MM-2 because no structures or support
> facilities are being proposed within Riparian Reserves.  Access to drill pads 6 and
> 7 will be limited to the use of existing roads already within Riparian Reserves (EA
> appendix F, figures 4 and 6), and no new roads are proposed for construction.
> The EA determined that the proposed action meets ACS objectives (EA p. 39-41).
> Mitigation Measure 24 (EA Appendix F, p. 3) requires that "[a]dverse effects to
> aquatic and other riparian dependent resources from mineral operations should be
> minimized or avoided," and the effects to Riparian Reserves have been
> determined to be minor (EA p. 35).  Additionally, Mitigation Measure 25 (EA
> Appendix F, p. 4) requires that "[e]xisting roads should be maintained to
> minimize damage to aquatic and riparian dependent resources," and erosion
> control measures are specified in the EA (EA p. 17-18).

Supp. AR 2840.

On summary judgment, Plaintiff argues that the permitted activity violates MM-2 because

structures, support facilities, and roads will all be located within riparian reserves which MM-2

generally prohibits.  Plaintiff argues that there is little, if any, discussion of how roads, drill pads,

structures, etc. will be precluded from riparian reserves and while MM-2 allows such items in

riparian reserves when no alternative exists, Plaintiff argues that the 2012 EA fails to discuss

alternatives for siting roads and the other structures.  Defendants and Ascot maintain that the drill

pads and associated drilling "assets" are not "structures" or "supporting facilities" under MM-2.

The Forest Plan does not define "structure" or "supporting facilities."  The USFS's

interpretation of a Forest Plan is entitled to deference.  Siskiyou Reg. Educ. Proj., 565 F.3d at

554-55.  Similar to other administrative agencies whose interpretations of their own regulations

are entitled to deference, the Ninth Circuit has recognized that "forest plan directives" are

"equivalent to federal regulations adopted under the APA," and thus, courts must defer to the

36 - OPINION & ORDER

USFS's "interpretation of plan directives that are susceptible to more than one meaning unless the interpretation is plainly erroneous or inconsistent with the directive." Id. at 555. If "neither the scope nor the effect of the regulation in question is ambiguous, there is no call for deference to the agency's legal interpretation." Id. (internal quotation marks and brackets omitted). However, in a 2006 case, in which the USFS argued that "settling ponds" were not "structures" or "support facilities" under MM-2, Judge Papak concluded that deference to the agency's interpretation was unwarranted when the agency itself had inconsistently interpreted the language. Hells Canyon Pres. Council v. Haines, No. 03:05-cv-01057-PK, 2006 WL 2252554, at *8 (D. Or. Aug. 4, 2006).

In support of its interpretation that the drill pads, drill shack, sumps, water conveyance pipes or water storage tank are not "structures" or "supporting facilities," Defendants and Ascot cite to dictionary definitions of the terms. According to Defendants, "structure" is defined as "'something (such as a house, tower, bridge, etc.) that is built by putting parts together and that usually stands on its own.'" Defs.' Resp. at 18 (quoting www.merriam-webster.com). "Facility" is defined as "'something (such as a building or large piece of equipment) that is built for a specific purpose.'" Id. (quoting www.merriam-webster.com). "Support" is defined as "'giv[ing] help or assistance to.'" Id. (quoting www.merriam-webster.com). Based on these definitions, Defendants argue that a "support facility" is reasonably understood to mean a building or large piece of equipment which is built for or to give help or assistance to the relevant mining activity, which in this case means the drilling operations that will occur on the pads.

Defendants argue that the construction or installation of a drilling pad and the temporary placement of movable drilling-related assets on that pad do not constitute construction of a

"structure" or "support facility" under these definitions.  They suggest that these items are not

"structures" because they are not akin to a house, tower, or bridge that is built by putting parts

together and then stands on its own.  They further suggest that these items are not a building or

large piece of equipment built to provide help to the drilling operation.  My understanding of the

underlying point of their interpretation is that to be considered "structures" or "support facilities"

under MM-2, items must be large in size and permanent.   My understanding was confirmed at

oral argument when Ascot's counsel stated that "size does matter" and that whether something is

a structure or facility depends on its size.

Plaintiff points to uses of the terms "build" or "install" in the 2012 EA, as well as to the

2012 EA's reference to a "structure" at the drill pad site.  E.g., 2012 EA, AR 1104 (noting that the

drill shack will be "installed" and that pieces of smaller equipment will be housed within or

positioned next to the drill shack "with a separate baffled structure"); AR 1100 (describing that

the "brushing excavator would be used for removal of vegetation, and for building sumps and

pads"); AR 1105 (describing that sumps "would be installed at each drill site . . . [and] installed

within the existing road prism"); see also id., AR 1104, 1220 (description of drill rig and

photograph of the drilling equipment indicating that while the drilling rigs initially travel to the

drill pads via a "self-propelled mechanism," they are then "unfolded" and set up at the cleared

drill pad).

Although the online dictionary definition of "facilities" relied on by Defendants and

Ascot includes examples of a "building" or "large piece of equipment," the dictionary that I find

most comprehensive does not include a concept of size for this term.  Rather, "facility" is defined

as "something that promotes the ease of any action, operation, transaction, or course of conduct -

[usually] used in [plural] (excellent *facilities* for graduate study)[;] something (as a hospital, machinery, or plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." Webster's Third New Int'l Dictionary 812-13 (2002).[8]

Here, the drill shacks are installed. 2012 EA, AR 1104. The sumps are installed. Id., AR 1104, 1105. These are actions that fit into the definition of "facilities" and there is no doubt that they are used to serve and facilitate the drilling operations. The USFS's interpretation that "support facilities" are limited to large, permanent structures is not rationally supported by the ordinary, commonsense understanding of the term "facilities." MM-2 uses no conditional or limiting language in terms of size or permanence and instead uses general and broad terms such as "structures" and "support facilities." Thus, MM-2 unambiguously includes "support facilities" of all sizes and duration. Even assuming the MM-2 language is ambiguous and the USFS's interpretation is entitled to deference, I conclude that at least as to the drill shacks and the sumps, the interpretation is arbitrary and capricious because it is plainly erroneous.

I agree with Defendants, however, about roads. MM-2 states, in regard to roads, that "[m]iles of road construction will be kept to the minimum necessary for the approved mineral activity. Such roads will be constructed and maintained to meet roads management standards and to minimize damage to resources in the Riparian Reserves." AR 24766. The project entails

---

[8]   The term "structure" does seem to imply a large item. Webster's Third New Int'l Dictionary 2267 (defining "structure" as "something constructed or built" with examples such as "the dam is a massive [structure]" and "demolish any building, highway, road, railroad, excavation or other [structure]" and also noting that the word refers especially to "a building of imposing size"). I need not determine if the drill pads, drill rigs, or drill shacks are "structures" given my conclusion that some of the drilling assets are "support facilities" implicating MM-2.

no new road construction.  2012 EA, AR 1099 ("[n]o new roads would be construed to access

any of the drill sites" because all of them are "located on or adjacent to the existing roads");

Supp. AR 2840 ("Access to drill  pads 6 and 7 will be limited to the use of existing roads already

within Riparian Reserves . . . .").  The plain language of MM-2 applies to the <u>construction</u> of

roads and does not apply to the use of existing roads or the temporary reactivation of

decommissioned roads.  The Project's use of such roads does not implicate MM-2.

     B.  MM-3

MM-3 requires that the USFS

[p]rohibit solid and sanitary waste facilities in Riparian Reserves.  If no alternative
to locating mine waste (waste rock, spent ore, tailings) facilities in Riparian
Reserves exists, and releases can be prevented, and stability can be ensured, then:

a) analyze the waste material using the best conventional sampling methods and
analytic techniques to determine its chemical and physical stability characteristics.

b) locate and design the waste facilities using best conventional techniques to
ensure mass stability and prevent the release of acid or toxic materials.  If the best
conventional technology is not sufficient to prevent such releases and ensure
stability over the long term, prohibit such facilities in Riparian Reserves.

c) monitor waste and waste facilities after operations to ensure chemical and
physical stability and to meet Aquatic Conservation Strategy objectives.

d) reclaim waste facilities after operations to ensure chemical and physical
stability and to meet Aquatic Conservation Strategy objectives.

e) require reclamation bonds adequate to ensure long-term chemical and physical
stability of mine waste facilities.

AR 24766.

     Plaintiff argues that Defendants violated MM-3 because the sumps are solid waste

facilities and the 2012 EA and the USFS's DN/FONSI contain no discussion of alternatives to

placing waste facilities inside the riparian reserves and fail to provide evidence that Defendants,

or Ascot, performed the required "analy[sis] [of] waste material using the best conventional

methods and analytic techniques to determine its chemical and physical stability characteristics."

Moreover, Plaintiff argues that the agencies fail to "prevent releases" from the disposal of the

waste, which is required even if there is no alternative to placing the waste within the riparian

reserves.  Plaintiff also complains that there is no substantive discussion of the chemical and

biological properties of the materials which are to be deposited in the sumps or dumped back into

the wells.  According to Plaintiff, all of these failures violate MM-3.

Defendants and Ascot argue that there is no violation of MM-3 because the sumps are not

"solid and sanitary waste facilities."  See USFS Appeal Dec., Supp. AR 2817 (explaining that the

permit is consistent with MM-3 because it "facilitates mineral exploration activities only; no

mine waste as described [in MM-3] would be generated" and because it "involves [only]

exploratory drilling, [and] no mine waste, ore or tailings would be removed or left within riparian

reserves"); Clarification of App. Decision, Supp. AR 2840 (explaining that permit is compliant

with MM-3 because "no solid or sanitary waste facilities have been proposed, and the issuance of

a prospecting permit limits activities to mineral exploration only"; noting that "[r]ock core and

drill cuttings will be taken off site for analysis and disposal" and "no mine wastes as described

[in MM-3] would be generated"; further explaining that mitigation measures 7-8 and 17-20

address the management and containment of waste or hazardous substances and provide

additional protections beyond that of MM-3).

While I agree with Plaintiff that the sumps are "facilities," as explained above, I agree

with Defendants and Ascot that they are not solid waste facilities under MM-3.  Unlike MM-2

which contains no limiting language on the term "support facilities," MM-3 contains a limiting definition for "waste." The first sentence of MM-3 prohibits "solid . . . waste facilities in Riparian Reserves." The next sentence, however, sets forth the conditions required when "no alternative to locating mine waste (waste rock, spent ore, tailings) facilities in Riparian Reserves exists[.]" Thus, the "solid waste" facilities that are mentioned in the first sentence are specified in the next sentence to mean facilities for three types of "mine waste": waste rock, spent ore, and tailings. Ascot and Defendants argue that because the permitted activity is only prospecting, meaning exploration, and not mineral development, meaning actual mining, the activity does not generate the type of "mine waste" that MM-3 regulates.

Plaintiff argues that relevant mining regulations make no distinction between actual "mining" and mining "exploration" in terms of environmental protection measures. I agree. But, Defendants' and Ascot's argument does not contend that an entire category of mining-related activity is per se exempt from regulation. Rather, the point is that given that this is exploratory drilling only, the type of waste generated is not "mine waste" as defined in MM-3. While the arguments may produce the same result, the latter focuses on the MM-3 language of "waste rock" rather than the wholesale exclusion of an entire category of mining activity.

"Ore" is "[t]he naturally occurring material from which economically valuable materials can be extracted." McGraw-Hill Dict. of Scientific & Tech. Terms 1491 (6th ed. 2003). As relevant here, "tailings" are "[t]he refuse material resulting from processing ground ore." Id. at 2098; see also www.dictionary.infomine.com (defining "tailings" as "[t]hose portions of washed ore or coal that are regarded as too poor to be treated further"). "Waste rock" is "[v]alueless rock that must be fractured and removed in order to gain access to or upgrade ore." McGraw-Hill at

2276.

Drilling "spoils" will be placed in the sumps.  2012 EA, AR 1105, 1109.  In addition to the liquid, the "spoils" contain drill cuttings and mud.  Id., AR 1105.  "Drill cuttings" are "[c]uttings of rock and other subterranean materials brought to the surface during the drilling of wellholes."  McGraw-Hill at 652.

The list of items that MM-3 defines as "mine waste" which are to be contained in a "solid waste facility" under MM-3 makes clear that "mine waste" refers to material obtained from the actual mining of rock.  All three items listed, "spent ore," "tailings," and "waste rock," carry an understanding that the reference is to the actual removal of material from underneath the earth's surface by some method other than the drilling of an exploratory wellhole.  In contrast, "drill cuttings," by the definition cited above and with the explanation in the 2012 EA that they are very fine in grain size, are not the type of "waste" produced by actually mining the ground for ore.  Neither is mud.  As a result, Defendants' interpretation of MM-3 to exclude the sumps is consistent with the plain language of MM-3, is reasonable, and is accorded deference.  Finally, MM-3 addresses only "solid" waste facilities and thus, any draining of the drilling liquid into the ground is not governed by MM-3.

IV.  NEPA

NEPA has two principal aims.  Balt. Gas & Elec. Co., 462 U.S. at 97.  First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action."  Id. (internal quotation marks omitted).  Second, NEPA guarantees that relevant information is available to the public.  N. Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085 (9th Cir. 2011); see also Citizens Comm. to Save Our Canyons

v. U.S. Forest Serv., 297 F.3d 1012, 1021 (10th Cir. 2002) ("Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts.").

"NEPA is a procedural statute that does not mandate particular results but simply provides the necessary process to insure that federal agencies take a hard look at the environmental consequences of their actions." High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal quotation marks omitted).  To comply with NEPA, federal agencies must prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C).

A federal agency initially "may prepare an Environmental Assessment '(EA)' to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS." High Sierra Hikers Ass'n, 390 F.3d at 639-40.  An EA is "a concise public document" that should:  "(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[;] (2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary[;] (3) Facilitate preparation of [an EIS] when one is necessary." 40 C.F.R. § 1508.9(a)(1–3).

"An EA must include brief discussions of the need for the [federal action], of reasonable alternatives, and of the anticipated environmental impacts." Hapner v. Tidwell, 621 F.3d 1239, 1244 (9th Cir. 2010); see also 40 C.F.R. § 1508.9(b).  An agency must then prepare an EIS "if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." Cal. Trout v. FERC, 572 F.3d 1003, 1016 (9th Cir. 2009) (internal quotation marks omitted); see also Jones v. Nat'l Marine Fisheries Serv., 741 F.3d 989, 997 (9th

Cir. 2013) (EIS is required when the "effects on the human environment are 'highly uncertain or

require unique or unknown risks[.]'") (quoting 40 C.F.R. § 1508.27(b)(5)).  An EA need not meet

all the requirements of an EIS, but "it must be sufficient to establish the reasonableness of the

decision not to prepare an EIS."  <u>Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety</u>

<u>Admin.</u>, 538 F.3d 1172, 1215 (9th Cir. 2008) (internal quotation marks and brackets omitted).

In its motion for summary judgment, Plaintiff alleges five separate NEPA violations:  (1)

failure to conduct a baseline groundwater analysis; (2) failure to adequately consider all

cumulative impacts; (3) failure to fully analyze all mitigation measures and their effectiveness;

(4) failure to consider all reasonable alternatives; and (5) failure to support the FONSI with the

required analysis.  The last argument rises or falls on the other alleged NEPA violations.  I

address the arguments in turn.

A.  Baseline Groundwater Analysis

The most extensive discussion of existing groundwater features in the 2012 EA is in

Section 3.2.1.4, addressing hydrogeological conditions.  2012 EA, AR 1119-20.  The section

begins with the statement that "[s]pecific hydrogeologic information related to the site was not

identified during completion of this EA.  Therefore, presented information is based on evidence

from sites in similar environments."  <u>Id.</u>, AR 1119.  The discussion continues with repeated uses

of words underscoring the fact that no baseline groundwater analysis was conducted as part of the

2012 EA's preparation.  For example, there are references to groundwater within the affected area

"likely" being found in unconfined and confined conditions and unconfined groundwater "likely"

being present within alluvial, tephra, and draft deposits overlying bedrock in the vicinity of the

Project Area.  <u>Id.</u>; <u>see</u> <u>also</u> <u>id.</u> at 1120 (noting that unconfined groundwater is variable and

45 - OPINION & ORDER

includes "thicker saturated intervals, <u>likely</u> within 10 feet of the ground surface"; noting that groundwater within the unconfined aquifer along the southern portion of Goat Mountain is "generally <u>assumed</u> to flow towards the Green River at the valley bottom"; using words such as "suspected," "reportedly," and "possibly") (emphasis added).

Nonetheless, even without the baseline groundwater study, Section 3.2.2.2 of the 2012 EA contains an almost five-page analysis of the Project's environmental impacts (direct, indirect, and cumulative) on hydrology and hydrogeology under the Proposed Action.  2012 EA, AR 1121-25.  Section 3.2.2.3 contains a similar two-page analysis under Alternative 3.  <u>Id.</u>, AR 1125-27.  Section 3.2.4 addresses groundwater impact avoidance and mitigation measures.  <u>Id.</u>, AR 1131.  The discussions indicate that the potential impacts to groundwater are to both water quantity and quality.  <u>See</u> USFS App. Dec., Supp. AR 2826.  Plaintiff's objection to the baseline groundwater study focuses on groundwater quality.

The 2012 EA states that drilling operations, drilling fluid management, and drill hole effects are elements of the Project that could directly affect groundwater.  2012 EA, AR 1122. Drilling operations include introduction of drilling fluids into the drill holes which are circulated to the ground surface to remove drill cuttings and to lubricate and cool the drill bit.  <u>Id.</u>  The Proposed Action does not specify environmentally protective performance criteria or industry standards for the drilling fluids, creating the "potential that toxic drilling fluid additives and lubricants would be used."  2012 EA, AR 1122.  However, Alternative 3 requires the use of drilling fluids that meet NSF/ANSI approval standards for drinking water wells, "which would reduce the potential for toxics compounds entering groundwater."  <u>Id.</u>, AR 1126.   Under Alternative 3, "[p]otential groundwater quality impacts would be mitigated to negligible levels."

46 - OPINION & ORDER

Id.; AR 1126.

The Proposed Action contains a description of the direct effects of the drilling operations

indicating that a byproduct of the drilling is the creation of pulverized formation material,

referred to as drill cuttings, and which could be as fine as rock flour.  Id., AR 1122.  The Project

entails approximately 110,000 feet of total exploratory drilling, based on the completion of 63

drill holes with an average drill hole length of about 1,750 feet.  Id.  Generation of "drill fines,"

based on the volume of formation displaced, would range from about 40 to 100 cubic feet per

drill hole.  Id.  Under the Proposed Action, less than 10 gallons of cuttings would be expected

based on returns observed during 2010 drilling and thus, most of the formation displaced during

drilling would remain in the ground.  Id.  "Drill cuttings that are not removed from the drill hole

would be combined with drilling fluids by the drilling action, and a portion of the cuttings would

be forced into the surrounding formation through hydrostatic pressures introduced by the drilling

fluid."  Id.

This "zone" around the drill hole which is penetrated by drilling fluid and rock flour is

called the "invasion zone."  Id., AR 1123.  The invasion zone around the drill hole has "reduced

porosity" as a result of the "drilling fluid and rock flour filling natural voids in the formation."

Id.  As the drilling fluid and rock flour move outward into the formation near the drill bit, the

surrounding rock filters the drilling fluid additives and rock flour from the drilling fluid.  Id.  The

drilling fluids and rock flour are contained in the invasion zone and once the formation is

sufficiently invaded, a "mudcake" forms on the drill hole wall which significantly limits the

introduction of additional drilling fluids.  Id.  The 2012 EA notes that prior studies have found

that invasion distances range from less than one foot outwards in high porosity formations, to ten

to fifteen feet outward in lower porosity formations.  Id.  Under the Proposed Action, drilling

additives are to be used as little as possible which likely results in an increased invasion zone and

allowing more sulfide mineral containing rock flour to be present in the invasion zone.  Id.  "The

presence of rock flour potentially containing sulfide minerals and metals that invades adjacent

formation material poses risk to groundwater quality since the geochemical characteristics of the

adjacent formation might be different than the invading rock flour, especially if the rock flour is

from another zone in the drill hole."  Id.

Under Alternative 3, the ability of sulfide minerals and metals contained in drilling fines

to enter formation water-bearing zones through the invasion processes are reduced by

"optimizing drill cutting return" through drilling methods that increase the return of drilling

fluids.  Id., AR 1125.  Although about 10 gallons of drill cuttings are expected to be returned

under the Proposed Action, under "Alternative 3, return of drilling cuttings to the ground surface

would increase reducing the volume of drill cuttings remaining in the ground."  Id.  The

"optimized drilling method would tend to promote reduced invasion of the surrounding

formation, replacing rock flour with drilling fluid additives that would meet drinking water well

standards, and would promote better drill hole wall 'mudcake' formation."  Id.  This in turn will

help seal adjacent formations to groundwater migration and will prevent cross-aquifer

environmental impacts.  Id.  "In instances where drill fluid circulation is lost, the formation

causing the loss would be sealed prior to continued drilling and the drill hole would be

abandoned if circulation could not be re-established."  Id.

Alternative 3 also includes monitoring requirements.  Transient effects to groundwater

resulting from drilling operations are to be monitored by periodic testing of groundwater samples

48 - OPINION & ORDER

collected from MM-10-10 and Duval Hole 06 before and during drilling.  Id., AR 1127.

Significant changes to groundwater chemistry are to be evaluated relative to drilling operations

and natural processes.  Id.

The discussion in Section 3.2.2.1 regarding the environmental impacts on hydrogeology

of the Proposed Action and Section 3.2.2.2 regarding the impacts of Alternative 3, show that the

2012 EA based its conclusion that groundwater impacts would be negligible on several factors

including information from similar environments, general hydrological and hydrogeological

principles, previous experiences with rock core drilling in 2012, the absence of mapped springs,

field reconnaissance conducted in November 2011, and various mitigation measures.  2012 EA,

AR 1116-31; see also 2012 EA, AR 1240 (App. C addressing public comments); AR 1277 (App.

F containing mitigation measures); USFS App. Dec., Supp. AR 2826.

Plaintiff argues that despite consideration of these factors, the failure to perform a

baseline groundwater analysis before assessing the environmental effects of the Project violates

NEPA because "[w]ithout establishing the baseline conditions . . . there is simply no way to

determine what effect the [action] will have on the environment, and consequently, no way to

comply with NEPA."  Half Moon Bay Fisherman's Mktg. Ass'n. v Carlucci, 857 F.2d 505, 510

(9th Cir. 1988); see also N. Plains, 668 F.3d at 1085 ("without [baseline] data, an agency cannot

carefully consider information about significant environment impacts.  Thus, the agency fails to

consider an important aspect of the problem, resulting in an arbitrary and capricious decision.")

(internal quotation marks and brackets omitted).  Plaintiff further argues that reliance on future

mitigation measures in the 2012 EA, such as installation of a closed drilling system, cannot

substitute for the required pre-approval NEPA review because the mitigation measures do not

assess the potential for environmental harm to various resources before project approval.

Ninth Circuit cases acknowledge the importance of obtaining baseline condition information before assessing the environmental impacts of a proposed project. In Half Moon Bay, the court analyzed the plaintiff's challenge to an EIS allowing the ocean dumping of material dredged from Oakland Harbor. In relevant part, it concluded that the agency violated NEPA because it failed to provide any site specific quantitative data regarding the physical, chemical, or biological oceanography surrounding the proposed dumping site, and because

> the final supplement fails to set forth any baseline conditions or a monitoring program for ocean disposal at a site in the vicinity of BI. "NEPA clearly requires that consideration of environmental impacts of proposed projects take place *before*" [a final decision] is made." LaFlamme v. FERC, 842 F.2d 1063, 1071 (9th Cir. 1988) (emphasis in original). Once a project begins, the "pre-project environment" becomes a thing of the past, thereby making evaluation of the project's effect on pre-project resources impossible. Id. Without establishing the baseline conditions which exist in the vicinity of B1 before ocean dumping begins, there is simply no way to determine what effect the proposed dumping near B1 will have on the environment and, consequently, no way to comply with NEPA.

Half Moon Bay, 857 F.2d at 510.

In Northern Plains, the plaintiff challenged the approval of applications to build a railroad line to haul coal, arguing that the EIS failed to provide adequate baseline data to assess the railroad's environmental impacts. 668 F.3d at 1083. The EIS actually noted the issue of potential vibrations causing harmful effects, particularly to fish at a nearby hatchery. Id. And, the Fish & Wildlife Service had asked the applicant to conduct additional baseline studies. Id. But, because of a concern that long-term studies would significantly delay the construction schedule, no baseline studies were done and the applicant railroad agreed to implement a mitigation measure plan for vibration monitoring at the hatchery. Id. at 1083-84.

50 - OPINION & ORDER

The court agreed with the plaintiff, holding that "[b]ecause the [EIS] does not provide baseline data for many of the species, and instead plans to conduct surveys and studies as part of its post-approval mitigation measures, we hold that the Board did not take a sufficiently 'hard look' to fulfill its NEPA-imposed obligations at the impacts as to these species prior to issuing its decision." Id. at 1083. The court noted that environmental impact analyses "must occur before the proposed action is approved, not afterward" and explained that

> such mitigation measures, while necessary, are not alone sufficient to meet the Board's NEPA obligations to determine the projected extent of the environmental harm to enumerated resources *before* a project is approved. Mitigation measures may help alleviate impact *after* construction, but do not help to evaluate and understand the impact before construction. In a way, reliance on mitigation measures presupposes approval. It assumes that -regardless of what effects construction may have on resources-there are mitigation measures that might counteract the effect without first understanding the extent of the problem.

Id. at 1083, 1084-85.

According to the court, because NEPA aims "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public[,]" the "use of mitigation measures as a proxy for baseline data does not further either purpose." Id. Without the baseline data, the agency cannot carefully consider information about significant environmental impacts and thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision. Id. Additionally, even if the mitigation measures may guarantee that the data will be collected in the future, the data is not available during the EIS process and is not available to the public for comment. Id. Thus, the process does not serve its larger information role and the public is deprived of the opportunity to play a role in the decision-making process. Id. Baseline information before approval is required so that the agency "can understand the adverse

environment effects *ab initio*."  Id.

In a 2012 District of Idaho case which analyzed an EA instead of an EIS, the plaintiff argued that the EA's conclusion that there was no significant impact to groundwater was arbitrary and capricious.  Idaho Conservation League v. U.S. Forest Serv., No. 1:11-CV-00341-EJL, 2012 WL 3758161, at *8 (D. Idaho Aug. 29, 2012) (ICL).  The agency made a determination that groundwater would not be significantly affected by the proposed activity because, essentially, surface water quality levels had not fallen below certain levels due to past and present mining activities.  Id. at *16; see also id. at *15 (agency argued that a baseline groundwater study was not needed because it was reasonable to conclude, based on the fact that past and present mining activities had not resulted in "exceedance" of any surface water quality beneficial use, no contaminates from the adjacent mines were apparent in the water downstream).  The agency also relied on "closed system drilling methods."  Id. at *16.

In arguing that the agency decision was arbitrary and capricious, the plaintiff relied on an expert's declaration explaining the impact on local groundwater conditions by drilling exploratory holes.[9]  This made the court question the reasonableness of the agency's determination that absent a baseline groundwater study, there was no significant impact to the groundwater.  Id.  Importantly, however, the court noted that even without that declaration, the agency acted arbitrarily and capriciously in reaching its decision of no significant impact on

---

[9]  The expert noted that "drilling exploratory boreholes can impact the local groundwater conditions by altering groundwater flow and drilling fluid and water leakage during borehole drilling."  Id. at *16.  The expert opined that the agency should have "conducted a baseline hydrogeologic study to examine the existing density and extent of bedrock fractures, the hydraulic conductivity of the local geologic formations, and measured the local groundwater levels to estimate groundwater flow directions before making a determination of no impact."  Id.

groundwater.  Id.  The court found that the very nature of drilling holes 1,500 to 3,000 feet into the ground would likely impact the underlying surface, including the groundwater.  Id.  The court concluded that the agency needed to have first conducted a baseline study and actual analysis of the groundwater in the area before reaching its conclusion.  Id.

Furthermore, the court rejected the idea that the closed drilling system alleviated concerns because the system was a mitigation measure which could not be used to satisfy NEPA's obligations and further, there was no ongoing monitoring mechanism to respond to possible impacts.  Id. at *16-17 (citing Northern Plains, 668 F.3d at 1083, 1084); see also Shoshone-Bannock Tribes of the Forest Hall Reservation v. U.S. Dep't of the Interior, No. 4:10-CV-004-BLW, 2011 WL 1743656, at *10 (D. Idaho May 3, 2011) (EIS was required because without groundwater studies,  there were substantial uncertainties about groundwater flows and potential contamination).

Defendants and Ascot argue that the extensive discussion in the 2012 EA reveals that the agencies properly concluded that the effects on groundwater would be negligible by relying on data from similar sites as well as mitigation measures to protect groundwater, including testing from the two on-site sources before drilling begins as well as periodically during drilling for potential contaminants.  Moreover, the fact that the on-site water is to be supplemented by purchased, regulated potable water sources means that the potential for inadvertent introduction of potential contaminants into groundwater is minimized.

Defendants and Ascot argue that Half Moon Bay and Northern Plains are inapplicable because those cases addressed EISs, not EAs.  I disagree with Defendants and Ascot on that point.  Defendants and Ascot cite no cases holding that baseline information is not required in

53 - OPINION & ORDER

cases involving an EA as opposed to an EIS.  An agency is required to take a "hard look" at

environmental consequences for either an EA or an EIS and this must be done "before, not after,

the environmentally-threatening actions are put into effect."  Nat'l Parks & Conservation Ass'n v.

Babbitt, 241 F.3d 722, 730, 733 (9th Cir. 2001) (EA violated NEPA); see also ICL, 2012 WL

3758161, at *17 (in assessing the sufficiency of the EA and concluding that the EA failed to

include adequate baseline information under NEPA, court relied on Northern Plains, an EIS case,

in discussing inappropriate reliance on mitigation measures to satisfy NEPA obligations).

Moreover, although ICL is distinguishable from the instant case in some respects, its

analysis of the EA at issue there is instructive.  Granted, the plaintiff in ICL relied on an expert

opinion that a baseline study would have provided valuable information about the groundwater

impacts.  No similar expert opinion is in the record here.  But, as noted above, the ICL court

made clear that even without that declaration, the agency acted arbitrarily and capriciously.  ICL,

2012 WL 3758161, at *16.  The court criticized the agency's reliance on findings regarding

surface water quality from past and present mining.  Id.  Similarly here, the agencies rely on

assumptions based on similar environments.  The ICL court criticized the agency's assumption

that the closed drilling system would eliminate further contamination to the water.  Id.  The same

problem exists here.  The ICL court noted that the very nature of drilling holes 1,500 to 3,000

feet into the ground was likely to impact the underlying surface, including the groundwater.  Id.

The same is true here.

The ICL court acknowledged the value in the various measures incorporated into the EA

designed to address groundwater contamination.  It explained that the "use of a closed system

drilling method, stability and sealing of the drill holes, the use of non-toxic drilling fluids, and

the employment of BMPs are all appropriate precautions to groundwater contamination issues."
Id. at *16 n.10.  As in ICL, those same or similar measures which are part of Alternative 3 in the
2012 EA are also important and "appropriate precautions to groundwater contamination."  But,
despite those "precautions," the ICL court still found the EA lacking because there was no
monitoring and there was no "baseline established upon which to conduct any monitoring of the
groundwater."  Id.  Here, while there is monitoring, there is no baseline upon which to assess that
monitoring.

    While Alternative 3's monitoring requirement is a notable distinction between the EA at
issue in ICL and the one here, it fails to make the holding in ICL inapplicable to this case.  There
are two problems with the monitoring as proposed in the 2012 EA.  First, the monitoring is post-
approval and was not done before assessing the impacts to groundwater.  The 2012 EA gives no
explanation for why no baseline study has been performed or for why no sampling of the water
has occurred in the Project area, at least in the currently existing holes of MM-10-10 and Duval
Hole 06.  While Alternative 3 requires sampling and monitoring before drilling, the failure to
obtain onsite data before analyzing the environmental effects means that such analysis cannot
possibly be based on all of the relevant information.

    Second, the monitoring is proposed for only the two preexisting holes with no ongoing
monitoring of the groundwater at any of the holes being drilled as part of the Project.[10]  Thus, as
a mitigation measure, it is unclear how the effects to groundwater caused by the drilling will
actually be assessed.  Furthermore, the 2012 EA does not explain why sampling at two discrete

---

    [10]  I recognize that the drill holes are to be sealed after drilling but I assume water
sampling can be performed at some or all of the drill holes upon commencement of drilling
and/or at completion before the drill hole is sealed.

holes not newly drilled as part of the Project will provide accurate information about contamination to groundwater at the drill sites.  The monitoring required as part of Alternative 3 fails to address the Project's impact to groundwater.

I reject Defendants' and Ascot's arguments that a baseline groundwater analysis is not required before the issuance of the EA because the sampling and monitoring are being used to confirm that no significant impacts are occurring rather than addressing an issue of insufficient data.  The cases Defendants and Ascot rely on are distinguishable.  In Jones, the plaintiff challenged an EA and FONSI which allowed a chromium mining project.  Jones, 741 F.3d at 989.  Relying on Northern Plains, the plaintiff argued that the agency inappropriately relied on monitoring in dismissing the impacts to the affected aquifer.  Id. at 999-1000 (noting that under Northern Plains, the agency cannot rely on monitoring and mitigation alone in reaching a FONSI).  The Jones court distinguished Northern Plains, however, noting that Northern Plains had concluded that the agency could not carefully consider whether the project would have a significant environmental impact without the appropriate pre-construction survey data.  Id. at 1000.  In contrast, in the case before it, the Jones court found that the expert's memorandum made an initial determination that although it was "possible" that a certain chemical "could be generated in a post-mining environment," it was "unlikely to be significant[.]"  Id. The memorandum then stated that "[t]his conclusion" should be confirmed with field studies.  Id.

The Jones court explained that "in context," the memorandum "established that Cr +6 generation is unlikely to occur at the site."  Id. at 999.  Thus, the agency had not recommended additional studies in order to address remaining uncertainty, as the plaintiff argued and as occurred in Northern Plains, but instead "made clear that the only way to ensure that Cr +6 does

56 - OPINION & ORDER

not reach harmful levels is to monitor how it behaves once mining begins." Id.  That is:

> The [] conclusion . . . does not . . . suggest that additional studies prior to mining [were] needed to resolve any remaining uncertainty with respect to Cr +6 generation.  Rather, the [memorandum] concluded that the risk of C4 r +6 generation is minimal, and recommended monitoring to account for any site specific variation that might become apparent once mining began.

Id.  Based on this discussion in Jones, Defendants argue that post-approval monitoring in this

case is sufficient and a baseline survey of groundwater did not need to precede the 2012 EA.

But, the EA in Jones concluded that the effects would not be significant based on a

"thorough study of the issues surrounding [pollutant] generation, includ[ing] data from numerous

test wells drilled at the mining sites, as well as a review of academic literature related to

[pollutant] generation and attenuation."  Jones, 741 F.3d at 998.  After reaching the conclusion,

the expert recommended monitoring not to erase remaining uncertainty, but to "confirm" that the

conclusion was correct.  Here, the groundwater effects analysis is based on data from other

locations and thus, the 2012 EA's conclusion of minimal impact is not based on data from the

actual Project site.  As a result, the post-approval, pre-drilling monitoring is not to confirm what

is already known about the site but is to generate data in the first instance.  Thus, even with the

sampling and monitoring required by the 2012 EA, the absence of baseline data means that the

2012 EA cannot have discussed the environmental effects of the Project on groundwater and

cannot have reached a conclusion about those effects based on all relevant information.

In the other case cited by Defendants, the plaintiff challenged the failure of the USFS to

prepare an EIS for a proposed timber sale.  Envt'l Protection Info. Ctr. v. U.S. Forest Serv., 451

F.3d 1005 (9th Cir. 2006) (EPIC).  It argued that the USFS relied on mitigation measures to

"downplay the adverse effects of the Project."  Id. at 1015.  In particular, the plaintiff argued that

the EA failed to provide data to support the efficacy of the mitigation measures.  Id.  The court

rejected the argument because "instead of analyzing potential impacts of a proposed action, and

then developing a plan to mitigate those adverse effects," the project in question "incorporates

mitigation measures throughout the plan of action, so that the effects are analyzed with those

measures in place."  Id.  Thus, the court explained, "it cannot be said that the EA fails to analyze

the effects of the mitigation measures; instead, the EA analyzes the Project under the enumerated

constraints and concludes that any environmental impacts will not be significant."  Id.

EPIC is distinguishable because first, it addressed the need for the EA to separately

analyze the effectiveness of mitigation measures, not whether the agency's effects analysis was

flawed for failing to include baseline condition data.  Second, while the changes to drilling fluids

and monitoring are discussed as part of Alternative 3, they are identified and described as

mitigation measures developed in response to the Proposed Action.  E.g., 2012 EA, AR 1108-10

(describing measures required by Alternative 3 including those made to drilling fluid

management to protect groundwater resources); AR 1126 (noting that Alternative 3 will mitigate

potential groundwater impacts to negligible levels and describing measures under Alternative 3);

AR 1131 (describing various measures required under Alternative 3 as impact avoidance and

minimization measures); 1240 (noting, in response to comments, that Alternative 3 modified

water related protection measures and drilling practices and referring to specific mitigation

measures for groundwater in Appendix F); AR 1277 (listing requirements imposed under

Alternative 3 as specific mitigation measures).  As such, the 2012 EA sets forth an analysis of

potential impacts of the Proposed Action, and then, via Alternative 3, developed a plan to

mitigate those adverse effects.  EPIC does not control here.

58 - OPINION & ORDER

In summary, while the 2012 EA contains a substantial discussion about the Project's impacts on groundwater, it fails to comply with NEPA's "hard look" requirement absent baseline groundwater information upon which the conclusion of negligible impact can be made. The mitigation measures incorporated into Alternative 3, like the same measures in ICL, likely go a long way to controlling possible contamination of groundwater, but, without baseline data, the impact to groundwater remains uncertain because there is no information as to the current conditions of the actual Project area. As a result, there is no way to determine what effect the action will have on the environment and thus, "no way to comply with NEPA." Half Moon Bay, 857 F.2d at 510.

B. Cumulative Impacts Analysis

Plaintiff argues that the 2012 EA failed to consider all cumulative impacts of the Project on the environment. Cumulative impacts are

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

In a 2010 case, the Ninth Circuit considered a "cumulative effects" argument as part of the plaintiff environmental group's NEPA challenge to the BLM's approval of an amendment to a plan of operations for an existing mineral exploration project in Nevada. Te-Moak Tribe v. U.S. Dep't of the Interior, 608 F.3d 592 (9th Cir. 2010). There, the BLM prepared an EA, concluded on the basis of the EA's findings that the amendment would not significantly affect the environment, and issued a DR/FONSI. Id. at 599. In addressing the cumulative effects

59 - OPINION & ORDER

argument, the Ninth Circuit said that

> "NEPA requires that where 'several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS.'" Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990)); see 40 C.F.R. § 1508.25(c)(3).  We also require that an EA fully address cumulative environmental effects or "cumulative impacts." See, e.g., Kern v. BLM, 284 F.3d 1062, 1076 (9th Cir. 2002) ("Given that so many more EAs are prepared than EISs, *adequate consideration of cumulative effects requires that EAs address them fully*.")[.]
>
> * * *
>
> In a cumulative impact analysis, an agency must take a "hard look" at all actions.  An EA's analysis of cumulative impacts "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." Lands Council, 395 F.3d at 1028. "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Neighbors of Cuddy Mountain, 137 F.3d at 1380.  "[S]ome quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." Id. at 1379.

Te-Moak Tribe, 608 F.3d at 603-04.

Although Plaintiff appears to generally attack all the cumulative impact sections of the

2012 EA as insufficient, it mentions only four expressly:  (1) recreation; (2) noise; (3)

hydrogeology; and (4) fisheries.  Accordingly, I limit my analysis to the cumulative impact

discussions of those four areas.

1.    Recreation

The 2012 EA cumulative effects analysis regarding recreation states:

The Proposed Action would not limit access to this area for recreation use; therefore, the only potential impacts would be from temporary noise and slightly increased traffic and work activity in the area.  The primary recreation use in the

immediate area is hiking, fishing, backpacking, trail and pack horse activities, wildlife and bird watching, hunting, and mineral collection.  These activities may be impacted by noise and human presence in the immediate area, but effects would be temporary and they would diminish as recreation activity moves away from the south face of Goat Mountain.  Noise could affect hunting; however, the Proposed Action would result in only localized temporary disturbance from noise and would, therefore, having negligible impacts on hunting.  Based on the above analysis and findings, temporary effects to recreation as a result of the Proposed Action would be negligible.

2012 EA, AR 1195.  The cumulative effects of Alternative 3 would be similar to the Proposed Action and be negligible.  Id., AR 1196.

Plaintiff argues that because the 2012 EA states that "timber management" is a current use of the affected area, id., AR 1191, and there is no analysis of the cumulative impacts of logging and timber management uses on the environment and recreational users of the forest, the agencies failed to provide the required quantitative or detailed information.  Defendants rely on the statement in the USFS's DN/FONSI that no other applications for new resource use proposals or authorizations are pending in the area of the proposed permit and further that there are no other activities with similar or overlapping effects in space and time.  Because there is no timber sale proposed in the area currently, there is no potential impact from any such sales.

Although the 2012 EA refers to "timber management" as a current use, the reference appears to be a recognition that the Project area is generally managed for timber-related uses, not that there is an active logging operation in the Project area.  With that understanding, the 2012 EA's cumulative impact discussion for recreation is sufficient because there are no applications for new resource use proposals and there are no other activities with similar effects.  The discussion quoted above regarding the cumulative impacts to recreation contains a sufficiently detailed analysis of the Project's impact on recreation.

61 - OPINION & ORDER

2.  Noise

The cumulative effects analysis in the 2012 EA regarding the impact of Alternative 3 on noise indicates that "[n]o cumulative noise effects are anticipated from the temporary use of drilling, vehicles or other equipment."  2012 EA, AR 1202 (for Proposed Action); AR 1203 (noting that for Alternative 3, the cumulative effects to noise would be similar to those stated for the Proposed Action and no cumulative effect is anticipated).

Plaintiff argues that this is a vague, conclusory analysis and is improperly confined to project-related noise impacts without considering how other existing or reasonably foreseeable activities or conditions could affect the impacts of project-related noise.  I disagree.  With no pending applications for new resource use proposals or authorizations, only currently existing activities or conditions are relevant.  The current use of recreation has limited ability to add to the cumulative impact to noise and as noted above, the general reference in the 2012 EA to the current "timber management" does not include any active logging activity.  The 2012 EA sufficiently discusses the cumulative effects on noise.

3.  Hydrogeologic & Fisheries

The 2012 EA sets forth the following discussion of the cumulative effects on hydrology and hydrogeology:

> Goat Mountain is within the St. Helens Mining District, Ryan Lake area. . . . The majority of limited mineral development in the area was conducted in the early 1900s, and little (if any) has occurred since then.  The inactive Polar Star Mine is located less than one mile west of the Proposed action; and an unnamed stream less than one-quarter mile to the east of the Project Area has three historic mine adits (small tunnels) nearby.  Acidic water has reportedly been documented at the Polar Star Mine and surface water samples collected by Ecology both upstream and downstream in the unnamed stream east of the area of the site have indicated elevated copper levels which exceed state water quality standards . . . It is

62 - OPINION & ORDER

unknown whether elevated copper in upstream samples is related to post exploration/mining activities or naturally occurring copper. However, the cumulative effects of the Proposed Action on surface water and groundwater quality are considered minimal relative to existing surface water and groundwater quality.

Local road history indicates that FR Road 2612 has been in place since well before the eruption of Mount St. Helens. On-going use of the road for recreation and forest management requires periodic maintenance during which fine sediment maybe [sic] mobilized, however, all practicable sedimentation controls will be implemented consistent with applicable erosion control measures and BMPs, including such additional mitigation measures subject to the authorizing Agencies' discretion. Recreational use including trail building and use have increased since the Green River Horse Camp was built. Where trails intersect with streams, some fine sediment is likely entering the watercourse.

Cumulative effects on streams are mostly related to additional small increments of the same kinds of effects as have occurred in the past and will continue to occur based on current uses. The re-growth of vegetation that serves to prevent erosion and sedimentation would be impacted in areas that are disturbed. However, the soils in the disturbance areas are relatively low in fine sediment content, and the locations of disturbance are far enough upstream on small tributaries that additional sediment is not likely to reach downstream. In addition, the placement of silt fences, mulch on roads, culverts at stream crossings, and water bars would further mitigate sedimentation. The collective consequences of these small incremental impacts would be minor and are considered negligible.

2012 EA, AR 1125. Cumulative effects on streams as a result of Alternative 3 are similar to those stated above for the Proposed Action. Id., AR 1127. As to groundwater, the cumulative effects would be positive because Alternative 3 "is protective of groundwater and could well become a model for future exploration activities within the Permit Area." Id.

As to fisheries,

[c]umulative effects on fish and aquatic habitat are mostly related to additional small increments of the same kinds of effects as have occurred in the past, such as timber management, road maintenance, equestrian activities, and other recreational activities. In areas that are to be disturbed, re-growth of vegetation that serves to prevent erosion and sedimentation may be affected. However, additional sediment is not likely to reach areas with fish because of the low fines

63 - OPINION & ORDER

content of the soil and the distance from disturbance sites to fish habitat.  The
collective consequences of these small incremental impacts are minor and
considered negligible.

Id., AR 1159-60.

Given my conclusion above that the 2012 EA violates NEPA because it lacks a baseline

groundwater study, the 2012 EA's discussion of the cumulative impacts of the Project on

groundwater cannot be sufficient.  As explained, without the baseline groundwater study there is

no way to determine what effect the Project will have on the environment; as a result, the 2012

EA could not have adequately discussed the cumulative impacts to groundwater.

Other than groundwater, however, I agree with Defendants that the 2012 EA gave a

sufficient "hard look" to the cumulative impacts on surface water and fisheries.  Plaintiff argues

that the cumulative effects analyses for hydrogeology and fisheries are insufficient because they

fail to discuss the combined impact of minor increases in sediment to waters that are already high

in copper.  Plaintiff contends that sediment loading from current uses as well as water pollution

from the Polar Star Mine will add to the water and fisheries impacts and the failure to discuss

these violates NEPA.

The 2012 EA states that analysis of surface water hydrology includes stream distribution,

water temperature, flow regimes, riparian habitat, wetland potential, and floodplains.  2012 EA,

AR 1116.  The 2012 EA considered the potential impacts to surface waters as a result of the

Project, including road crossings, erosion, and sediment delivery to streams.  Id.  The 2012 EA

contains a description of the surface water characteristics which mentions the presence of the

relatively high amounts of copper that "appear to be naturally present in the Project Area

drainage system." 2012 EA, AR 1118-19.[11] It notes that the elevated copper levels "mean[] that the area has been identified as an area with water quality issues." Id., AR 1119. The 2012 EA reports that "[a]ll historic and current uses have the potential to impact water resources in the Project Area." Id., AR 1119. It notes the three mine adits, the data indicating increases in surface water and sediment copper concentrations downstream of the adits, the downstream Polar Star Mine which is reported to discharge low pH water with high conductivity, the Green River Horse Camp which attracts recreational equestrian users and hikers, and the presence of existing logging roads which cross all of the drainage with the crossings managed by installation of culverts and removal following timber harvests. Id.

Contrary to Plaintiff's assertion, the 2012 EA discusses the current uses as well as the effects from the Polar Star Mine. The 2012 EA explains that the cumulative effects on streams are mostly related to small increments of the same kinds of effects as have occurred in the past and will continue to occur based on current uses. 2012 EA, AR 1125. As to current uses, it notes that the maintenance required for FS Road 2612 may mobilize fine sediment and that where recreational trails intersect streams, some fine sediment is likely to enter the watercourse. Id. As to the Project, it notes that the re-growth of vegetation that serves to protect erosion and sedimentation would be impacted in areas that are disturbed. Id.;

The 2012 EA explains why the collective consequences of the small incremental impacts will be minor and negligible. Id. It refers first to the implementation of "all practicable sedimentation control measures and BMPs," and the placement of silt fences, mulch on roads,

_____

[11] As noted above, the 2012 EA also notes that it is unknown if the elevated copper in upstream samples is naturally occurring or related to past exploration or mining activities. 2012 EA, AR 1125.

culverts at stream crossings, and water bars.  Id.  Next, it explains that the soils in the disturbed areas are relatively low in fine sediment content and the locations are far enough upstream on small tributaries that additional sediments is not likely to reach downstream.  Id.

The 2012 EA gave the requisite "hard look" at the cumulative effects of sedimentation on stream water.  It discussed the sediment-producing current uses and the sedimentation-related effects caused by the Project.  It explained that the combination of the mitigation measures, the content of the sediment, and the location of the disturbed area means that the cumulative effects would be minor.  Nothing more was required.  The same is true as to the existing water quality in terms of the copper content and pH levels because the 2012 EA discusses the baseline conditions and concludes that the cumulative effects of the Proposed Action will minimally effect surface water quality.  2012 EA, AR 1125, 1127.  Finally, the 2012 EA's discussion of the cumulative effects on fish is also sufficient.  The 2012 EA took a 'hard look" at the cumulative impact when it noted the current uses such as road maintenance and equestrian activities but found the impact to be minimal because of the fine content of the soil and the location of the disturbance areas.  Id., AR 1159-60.

C.  Mitigation Measures

"An agency decision to forego issuing an EIS may be justified in some circumstances by the adoption of [mitigation] measures."  Nat'l Parks & Conservation Ass'n, 241 F.3d at 733.  As explained in National Parks:

> If significant measures are taken to mitigate the project's effects, they need not completely compensate for adverse environmental impacts.  While the agency is not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures, the proposed mitigation measures must be developed to a reasonable degree.  A perfunctory description, or mere listing of mitigation

measures, without supporting analytical data, is insufficient to support a finding of no significant impact. In evaluating the sufficiency of mitigation measures, we consider whether they constitute an adequate buffer against the negative impacts that may result from the authorized activity. Specifically, we examine whether the mitigation measures will render such impacts so minor as to not warrant an EIS.

Id. at 734 (internal quotation marks and footnote omitted); see also S. Fork Band Council v. U.S. Dep't of the Interior, 588 F.3d 718, 727 (9th Cir. 2009) (discussion of mitigation measures' effectiveness is an "[e]ssential component of a reasonably complete mitigation discussion"; mitigation discussion without at least *some* evaluation of effectiveness is useless in making [the] determination [of whether environmental impacts can be avoided].").

Plaintiff argues that the 2012 EA fails to adequately analyze the effectiveness of its many mitigation measures. Defendants and Ascot counter that under EPIC, 451 F.3d 1005, no separate analysis of the effects of mitigation measures is required because here, the mitigation measures are incorporated into Alternative 3 and the environmental effects of the Project were analyzed with those mitigation measures in place. As a result, no separate discussion of the mitigation measures' effectiveness is required.

I agree with Plaintiff. As I read the 2012 EA, and as I explained above in discussing the groundwater issue, the Proposed Action contains few mitigation measures. Alternative 3 added mitigation measures as a way to reduce adverse impacts to the point where an EIS was not needed. Thus, in contrast to the EA in EPIC, here, the 2012 EA discussed the potential impacts of the Proposed Action and then developed a plan to mitigate the Proposed Action's adverse effects. That "plan to mitigate" is Alternative 3. As a result, the Proposed Action does not integrally incorporate the mitigation measures as was the case in EPIC. For the analysis in EPIC to apply here, the Proposed Action itself would have had to include the mitigation measures.

67 - OPINION & ORDER

And while the draft EA issued in June 2012 contained Alternative 3, it is clear that after the draft was released and after public comments were obtained, additional mitigation measures were added to Alternative 3, further reinforcing the conclusion that these were not integrally incorporated into the 2012 EA.  2012 EA, AR 1097 (describing the public announcement of the draft EA on June 29, 2012, the receipt of over 6,000 comment documents, and the additional modifications of Alternative 3 in response to the comments which added several "additional stipulations and mitigation measures" including (1) scheduling the activities around wildlife and recreation concerns; (2) balancing water use between on-site sources, re-use of drilling fluids, and water from off-site sources; (3) managing drilling fluids to improve re-circulation and minimize subsurface impacts; (4) monitoring the quality of existing water resources during drilling activities; and (5) requiring that all drill holes be sealed after completion).   Accordingly, I agree with Plaintiff that the 2012 EA fails to address the effectiveness of the mitigation measures.

   D.  Reasonable Alternatives

   Plaintiff argues that the three alternatives considered by the 2012 EA were not enough to satisfy NEPA's requirement that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  Although NEPA does not require an agency to consider every possible alternative to a proposed action, Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 871 (9th Cir. 2004) ("NEPA does not require the EIS to have considered every conceivable permutation of flow and non-flow measures"), it must give alternatives full and meaningful consideration.  Ctr. for Biological Diversity, 538 F.3d at

68 - OPINION & ORDER

1217; see also 40 C.F.R. § 1508.9(b) (noting that the EA must include a brief discussion "of. . . alternatives as required by section 102(2)(E)").

Plaintiff argues that the 2012 EA never analyzed the reasonable alternative of keeping all "roads, structures, and support facilities" out of the riparian reserves.[12]  Defendants and Ascot note that three alternatives were considered and examined in depth.  Additionally, three other alternatives were mentioned but not analyzed in detail because they were infeasible or were not measurably different from the alternatives considered.  2012 EA, AR 1111.  Ascot additionally argues that analysis of the "No Action Alternative" satisfied NEPA, meaning that the "No Action Alternative" was sufficiently similar to an alternative omitting drilling in the riparian reserve areas such that no separate discussion of that alternative was needed.

Although an agency's obligation to consider alternatives in an EA is less than in an EIS, agencies are still "required to consider alternatives in both EISs and EAs and must give full and meaningful consideration to all reasonable alternatives." Te-Moak, 608 F.3d at 601-02.  I agree with Plaintiff that the alternative of keeping drilling and related facilities out of the riparian reserves is not unreasonable.  I also agree with Plaintiff that the "No Action Alternative" is not so similar as to eliminate the need for a separate discussion of the "No Riparian Reserve Alternative" Plaintiff advocates for because there is a significant difference between an alternative of complete project denial under the "No Action Alternative," and an alternative that

---

[12]  I reject Defendants' argument that Plaintiff has waived this argument for failure to previously raise it to the agency.  Public Citizen, 541 U.S. at 764-65 (any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action was forfeited when not previously raised to the agency).  The record shows that Plaintiff raised this issue in its administrative appeal.  AR 72.  Thus, there can be no waiver.

69 - OPINION & ORDER

allows the majority of the Project to proceed, albeit on a somewhat reduced scale.

Although the 2012 EA discussed the three alternatives, the agencies were presented with a reasonable alternative that was not addressed. This was error. I agree with Plaintiff that the agencies violated NEPA by failing to discuss a "No Riparian Reserve" alternative.

E.  Unsupported FONSI/Requirement of an EIS

As Plaintiff indicates in its Reply Memorandum, this is not a separate argument but is a necessary conclusion if Plaintiff succeeds on its other NEPA arguments. That is, if the 2012 EA is deficient under NEPA in one of the ways Plaintiff has previously argued, then the USFS's DN/FONSI is necessarily arbitrary and capricious because it relied on the 2012 EA. Because I agree with Plaintiff that the 2012 EA violated NEPA in some of the ways argued by Plaintiff, I agree with Plaintiff that the USFS's DN/FONSI is deficient.

CONCLUSION

Plaintiff's motion for summary judgment [36] and Ascot's motion for summary judgment [44] are granted in part and denied in part. Plaintiff shall prepare an appropriate Judgment consistent with this Opinion, and after conferring with counsel for Defendants and Ascot, shall submit it to the Court for signature. If the parties cannot agree on a Judgment, they should notify my Courtroom Deputy who will schedule a telephone conference.

IT IS SO ORDERED.

Dated this ___3___ day of ___JULY_____, 2014

_____
Marco A. Hernandez
United States District Judge

70 - OPINION & ORDER